# CHARLESTON.

## BLACK *v.* POST.

### Decided March 22, 1910.

1. DEEDS—*Presumptions—Mental Capacity of Grantor.*

     The law presumes that the grantor is sane and possessed of sufficient mental capacity to make a deed at the time of its execution, and the burden of proving that he was not then sane, or competent, is on the one attacking its validity.

2. SAME—*Validity—Mental Capacity of Grantor.*

     If a person is capable of knowing the nature, character and effect of his deed at the time of making it, he is considered as legally *compos mentis.*

3. SAME—*Validity—Mental Capacity of Grantor—Fraud.*

     Eccentricity of manner and mental weakness of the grantor

which does not amount to imbecility are not sufficient to overthrow a deed in the absence of proof of fraud in its procurement.

4.   FRAUD—*Sufficiency of Evidence.*

Fraud will not be inferred from proof of the mere opportunity to commit it; there must be evidence of actual fraud; this evidence may be either direct or circumstantial, and, if circumstantial, the facts and circumstances relied on to establish fraud must be inconsistent with fair dealing.

Appeal from Circuit Court, Upshur County.

Action by Rebecca Black against A. V. Post and others. Pending suit, pliantiff died and Jane Bonnell was substituted in her stead. Judgment for plaintiff, and the mentioned defendant appeals.

*Reversed and Remanded.*

*H. Roy Waugh* and *C. M. Murphy,* for appellant.

*U. G. Young* and *W. S. O'Brien,* for appellee.

WILLIAMS, JUDGE:

Rebecca Black owned a tract of 140 acres of land in Upshur county, and, on the 25th of December, 1906, conveyed it to her nephew, A. V. Post, in consideration that he would support her while she lived, supply her with medical attention in case of sickness, and at her death give her a respectable burial, and in further consideration that he would pay to Rosie Bonnell and Charley Bonnell, her grandchildren who were then infants about the age of thirteen and sixteen years respectively, $500 each, which was not to become payable until each of the said infants should arrive at the age of twenty-one years, and then to be paid in installments of $50 per year without interest.

On the 14th of January, 1907, she brought this suit in the circuit court of Upshur county to have the conveyance set aside and declared void on the following grounds: (1) mental incompetency in the grantor to make a conveyance; (2) inadequacy of consideration; and (3) fraud in the procurement of the deed. Pending the suit Rebecca Black died, and an amended bill was filed by. Mrs. Jane Bonnell, her daughter and only heir at law and the mother of the grandchildren provided for in the deed. The defendant answered and denied specifically all

the allegations of the bill.   The case turns upon whether, or
not, the depositions of witnesses taken and filed in the case are
sufficient to sustain the charges in the bill.   The evidence is
voluminous, covering over five hundred pages of the printed
record.   It would be a laborious and useless task to review all
the testimony in this opinion; it could serve no useful purpose.
The most of it has no special bearing on the case.   It consists
largely of the opinions of Rebecca Black's neighbors concerning
her competency, or incompetency, to make a deed; many of the
witnesses being of the opinion that she was not competent, and
others being of the opinion that she was competent, to make
the deed.   One witness goes so far as to say that he did not
believe she knew right from wrong, and bases his reason for
this belief on the fact that Rebecca Black did not attend church;
others stated that they did not regard her as competent to
transact business, and based their opinion on the ground that
she told them she wanted to get married, that she had said she
would make a deed for half her farm to some good man if he
would marry her and take care of her.   The proof shows that
she had been a widow for about four years, that she lived on
this farm all alone, that she was not physically able to take
care of the farm and feed her stock, that she could not secure
the services of a reliable man to do it for her, that her manner
was disagreeable, that she was odd and eccentric, and that her
daughter, Jane Bonnell, seldom went to see her.   Rebecca Black
was at this time about sixty-three years of age.   Under these
circumstances we do not think that her expression of a desire
to get married was evidence of mental weakness.   True she
evinced more candor in regard to this matter than is usually
disclosed by her sex; this proves that she did not possess that
high degree of modesty concerning matrimonial affairs that is
usual in womankind, but it does not prove mental incapacity.
She may have been influenced more by motives of business than
of sentiment to make known her wish to get married, and may
have adopted this method of making her wish known.   Men
sometimes convey all their property in consideration of marriage,
and display good judgment in doing so.   Why then impeach a
woman's competency to transact business who is willing to con-
vey only half her property in consideration of marriage?   Re-
becca Black's failure to attend church is no evidence of want

of business capacity, or of the fact that she did not know right from wrong. It might just as well be taken as evidence to prove the contrary. She may have refused to attend upon the services of the church because she did not want to be reminded of her sins. Many of the witnesses, who gave their opinions that Rebecca Black was not competent to make the deed, are shown to have had dealings with her; either in the way of leasing land from her for the purpose of raising crops, harvesting her meadows for a share of the crop, or purchasing cattle from her. It is clearly proven that, during her husband's lifetime, she looked after her own business and did her own trading. It is true she often sought the opinions of others concerning the value of certain property she desired to sell. This is nothing more than most people do. Some people get their information as to the market value of articles by reading the published reports of the market, others by inquiry of those on whose judgment they rely. Few persons depend altogether on their own judgment, and those who do so usually evince bad judgment. That Rebecca Black was eccentric and peculiar in her manner, thought and speech there can be no doubt, but that she was competent to transact business, and had sufficient mind to make disposition of her property and to know the effect of a deed of conveyance, we think there can be as little doubt.

The presumption of law is always in favor of the competency of the grantor to execute a deed at the time it was made, and the burden of proof is on the party attacking the deed to overcome this presumption. Smith on Frauds 187; *Eakin* v. *Hawkins,* 52 W. Va. 124; *Irwin* v. *Hedrick, Id.* 537; *Delaplain* v. *Grubb,* 44 W. Va. 612; *Snodgrass* v. *Knight,* 43 W. Va. 294; *Buckey* v. *Buckey,* 38 W. Va. 168. The judge of the circuit court, in deciding this case, rendered a carefully prepared written opinion which is made a part of appellee's brief. We conclude our observations upon the question of the grantor's sanity and mental capacity at the time of making the deed with the following quotation from that opinion, viz: "But when the opinions of these witnesses are analyzed in the light of the facts upon which they are based, there is scarcely a fact in the case tending to warrant the opinion that she was insane. Neither is there much to justify the opinion that she was an imbecile, or *non compos mentis,* and incompetent to transact the ordinary busi-

ness affairs of her life. For ·twenty years or more she held her property in her own name and dealt with it herself, buying and selling her stock, ·and disposing of the products of her farm. This was the case when her husband was living, as much as after his death. With but few exceptions her trades appear to have been based on good ordinary judgment. She knew the value of money and how to keep it. She was close and penurious, frugal to a fault, but always met her obligations with promptness and honesty."

Having ascertained that the grantor had sufficient capacity to dispose of her property, which is the point on which plaintiff chiefly relied, and the one upon which the overwhelming amount of testimony seems to center, it goes a long way towards disposing of the other charges of inadequacy of consideration and fraud in the procurement of the deed. Inasmuch as the law gives a person an unqualified right to dispose of his property as he pleases, even to the extent of giving it away, it necessarily follows that inadequacy of consideration is not alone sufficient to overthrow a deed. It is only evidence to be considered along with other facts and circumstances bearing on the charge of fraud in the procurement of the deed. Is this charge sustained? We think not. The grantee is a nephew of Rebecca Black, he is her brother's son. Rebecca Black, having, as we find, sufficient capacity to dispose of her property, had a right to give it to her nephew if she so desired. We are unable to discovery from the evidence that any unlawful means were used to induce her to make the deed. She proposed to her nephew the making of the deed. Her motive seems to have been self-protection, her support. There is no proof that he, or any one else, persuaded her, against her free will, to make the deed, or that she was deceived or misled. Fraud can not be inferred from the grantor's age and enfeebled state of health; and the need of someone to take care of her property and to provide for her. These circumstances alone do not prove fraud. They may be simply matters of inducement which inclined her to make the deed, which she did, apparently, with perfect freedom of will, and mental comprehension as to the nature and effect of a conveyance. The only testimony we find in the record as to what took place between Rebecca Black and the defendant, leading up to the execution of the deed, is that of the defend-

ant himself who states that Rebecca Black proposed to him that, if he would pay the Bonnell children $500 each, and would agree to take care of her, she would make him a deed for her land, and told him to get a lawyer, or some good man who knew how, to come and write it, and that he, the next morning, went to the house of E. D. Bean, who he says was the notary nearest the place, and got him to come and prepare the deed and take Rebecca Black's acknowledgment to it. There is no evidence that the grantee ever said, or did, anything to influence the mind of Rebecca Black to execute the deed to him, or that the deed was prepared by the scrivener otherwise than she wanted it prepared.

That such undue influence was exerted upon the grantor as to overcome, or destroy, her free agency, and to substitute the will of another for her own, must be proven. The proof of a motive and an opportunity to exert such an influence, without more, is not sufficient to overthrow the deed. *Woodville* v. *Woodville,* 63 W. Va. 286; *Deleplain* v. *Grubb,* 44 W. Va. 613.

As to the value of the land the proof is, taking the average estimate, that it is worth about $4,500, that some parts of it are underlaid with a valuable seam of coal which some of the witnesses estimate to be worth $100 an acre. Other witnesses state that this vein of coal underlies only about five acres of the land; that the annual rental value of the land for farming purposes is only about $125. So that, taking into consideration the obligation of the grantee to pay the Bonnell children $1,000, and to support the grantor, then only sixty-three years of age, and furnish her care and medical attention in case of sickness, we can by no means say that the consideration is so inadequate as to shock the moral conscience. It assured the grantor a comfortable support and a decent burial, and this seems to have been the controlling thought in her mind. Her farm, without some one to cultivate it, to harvest and take care of the crops, would contribute nothing towards her support, in view of her inability to do the work herself. Her daughter, Mrs. Bonnell, appears to have shown her but little attention, in fact seldom visited her, until after she learned of this conveyance to A. V. Post, and then she suddenly became very solicitous about her mother's welfare, as did a number of other relatives in the neighborhood. These persons apparently set themselves to work

to turn the mind of Rebecca Black against A. V. Post, and no doubt induced her to bring this suit to avoid her deed.

There is another matter appearing in the deed which not only placed an additional contingent burden on the grantee, but which is further proof of the fact that Rebecca Black knew both what she was about at the time she executed the deed, and the probable value of her land. The deed provided that, if the coal underlying the land was sold for $100 an acre during the lifetime of Rebecca Black, then her two grandchildren, Charley and Rosie Bonnell, were to have $200 each. This provision was more than likely suggested by Rebecca Black herself; there is no reason to suppose that it was voluntarily proposed by A. V. Post.

The fact that the grantor hastened early on the morning of the 25th of December, the day after Rebecca Black proposed to make the deed, to get a notary to write it, is relied on as evidence of fraud. The oral agreement to convey was made on the day before; the execution of the deed was in consummation of it. Why could he not consistently procure the deed to be made as soon thereafter as possible? He may have thought, and doubtless did think, that if some of Rebecca Black's relatives should learn of her purpose to convey her land to him they would try to dissuade her from doing so, and he was therefore anxious to have the matter consummated. She was not legally bound by her oral promise, and many persons, possessed of even stronger will power than Rebecca Black, have been known to change their minds, when not legally bound not to do so, in less time than twenty-four hours. Having exerted no influence on her mind to induce her to make the deed, and she being competent to make it, there is certainly no fraud in procuring some person competent to write the deed and take the acknowledgment thereto at any convenient time thereafter, however soon it may be.

There is no lien retained in the deed to secure the grantor's support, and this omission is urged as a badge of fraud. The grantee was personally bound to furnish her support, and there is no evidence that he made any effort to avoid his contract. Neither is there any proof of an agreement that such lien was to be retained in the deed, or that the grantor requested it to be done. Deeds are often executed without reservation of a lien to secure the unpaid purchase money, even where the considera-

tion is wholly pecuniary, and while it is the usual practice, and a safe method to pursue, to retain such lien, we do not think the mere failure to do so is evidence of fraud, especially is this true in the absence of an agreement that such lien was to be retained.

After Bean had returned from Rebecca Black's, after writing the deed and taking her acknowledgment, he was asked by some of the neighbors where he had been, and his reply was that he had been up to write Lum Post's will. This statement is admittedly untrue, and it is urged as showing fraud, a desire to cover up, to conceal what had actually been done. But we regard it as wholly immaterial and a trivial matter, so far as it relates to the merits of the case. Lum Post was the father of the grantee and the brother of the grantor; he knew that his neighbors would be curious to know what had been the occasion of Bean's visit to the neighborhood, knowing that he was a notary public, and that he often prepared deeds and wills, and he suggested to him this reply in case he was asked where he had been. The purpose of the remark was apparently to deceive those who Lum Post knew were possessed of sufficient idle curiosity to inquire into the business affairs of their neighbors in which they had no pecuniary interest. He no doubt thought that he could thereby defer the evil day which he felt sure would come to his son, A. V. Post, as soon as the information should reach the ear of Mrs. Jane Bonnell, the prospective heir of Rebecca Black, that she had conveyed away her land. He very likely suspected that as soon as the transaction became known to certain others of the relatives of Rebecca Black they would set about to persuade her to bring a suit to avoid the deed. This piece of deception has no relation to the merits of the case. It does not prove that the deed was fraudulently obtained, and, under the circumstances of this particular case, we do not think it even tends to prove fraud. We hold the deed from Rebecca Black to A. V. Post to be valid.

For the reasons herein expressed we are of the opinion that the circuit court erred in decreeing a cancellation of the deed from Rebecca Black to A. V. Post bearing date on the 25th of December, 1906, and the final decree made in this cause on the 25th of January, 1908, will be reversed, and the cause remanded for further proceedings in the matter of the settlement of the

accounts of S. C. Rummissell, special receiver, of the personal property belonging to the estate of Rebecca Black, now deceased.

*Reversed and Remanded.*