## . CHARLESTON.

### TURNER v. HINCHMAN.

Submitted March 20, 1912.   Decided December 19, 1912.

1. DEEDS—*Execution—Undue Influence.*

   When a deed is made by a man eighty-eight years of age, long suffering from painful disease, feeble in body and mind from age and disease, which deed conveys all his lands, of great value, to two sons in whom he reposed confidence, who transacted his business, and resided close to him, the deed drawn by one of the sons at his own home, not in the presence of the father. executed in the presence of the two sons, in the absence of four daughters living at a distance, the deed not read or explained to the father, the sons having had a private interview the day before, which deed conveys to the sons all the father's land, of great value, whereas the daughters are to be paid money far less than the value of the land. He had often expressed an intent to bestow his land equally upon all his children. At the date of the deed one of the sons held a deed for all his father's land. The father within a few months before and after the deed to the two sons made wills and deeds inconsistent with the deeds to the two sons, as if he still owned the land. These circumstances make a strong *prima facie* case. of undue influence, and call for clear evidence of fair dealing on the part of the sons. (p. 385).

2. UNDUE INFLUENCE—*Procurement of Deed.*

   The facts and circumstances of this case establish undue influence upon the grantor in the procurement of a deed conveying land. (p. 385).

   (WILLIAMS and ROBINSON, JUDGES, dissenting).

Appeal from Circuit Court, Kanawha County.

Bill by William Turner and others against Joseph W. Hinchman and others. From a decree of dismissal, William Turner and others appeal.

*Reversed and Remanded.*

*Vinson & Thompson* and *T. J. Bryan,* for appellants.

*J. S. Miller, C. H. Hudson, Ellison & England* and *George J. McComas,* for appellees.

BRANNON, PRESIDENT:

By a deed dated 29th May, 1905, James H. Hinchman conveyed to his two sons, George R. Hinchman and Joseph W. Hinchman, five tracts of land in Logan County aggregating 1162 acres. This is a suit brought by other children of James H. Hinchman to annul and set aside the deed on the grounds that James H. Hinchman was mentally incompetent to make it, and that his sons obtained it by undue influence upon their father. The case resulted in a decree dismissing the suit, from which William Turner and wife and other parties have appealed.

The evidence in the case is from many witnesses on both sides. It is useless to recite it. We have come to the conclusion, from the evidence and circumstance of the case, that James H. Hinchman was mentally incompetent to make the deed, from weakness of mind and undue influence exerted upon him by his sons, leaving his mind not free.

Opinion evidence is given on both sides to show that he was competent and incompetent. Perhaps we may say that this oral evidence of incapacity is stronger than that of his capacity, because coming from persons who were with Hinchman more than those asserting his capacity and better able to judge. But we test the case more by the circumstances, and when we add to those circumstances beyond dispute the oral evidence of incompetency, we think such oral evidence has great weight taken along with such circumstances. James H. Hinchman when he made that deed had attained the great age of eighty-eight years. He was then, and for some time before had been, afflicted with chronic diarrhoea *angina pectoris* and senile infirmities. He was confined to his bed most of the time. For several years not going out. His acts touching his valuable estate were utterly inconsist-

ent with each other, and tend to show that he really did not know his estate or its value, and had no fixed ideas as to the object of his bounty.  He had left six children, the two sons to whom the deed in question was made and four daughters.  See how unreasonable and inconsistent were his acts as to his land.  By a deed the 19th of March, 1904, he conveyed all these lands to one son, George R. Hinchman.  Though not the owner of the land after that deed, yet he made a will on the 20th of August, 1904, at the instance of Joseph Hinchman, saying that he understood that a deed was on record purporting to be signed by him, conveying to George R. Hinchman said land, and reciting that at the date of the deed he was sick and unable to transact business of any character on the account of ill health and age, and saying that George Hinchman that day prepared and brought it to him in the night time and without reading it insisted on his father executing it, and had paid nothing, and had thereby obtained from him, against the interest of his other children, and without just reason to do so, all the real estate owned by him; and saying that it was not his purpose to discriminate against his other children and take from them an equal share of his estate in favor of George Hinchman; and saying that George had obtained the deed by misrepresentation, undue influence and improper conduct, and that he, the father, desired to annul it and to give all his children equal shares; and by said will he devised said land equally among his children.  James H. Hinchman had been recorder of Logan County and had been a member of the House of Delegates in days gone by, and yet his mind had so far weakened that he did not know that he could not by will cancel the deed to his son or give the land to others.  The old man thought he was still owner of the land.  What his next act?  George Hinchman likely heard of that will.  He went to his father with a prepared deed and had him execute it on the 15th of September, 1904, conveying the same land by more particular description, saying this second deed was to cure any defect that might exist in the former deed by reason of vagueness of description.  The former deed seems sufficient in this respect, and the true reason likely was to get the father's confirmation and doubly bind him, and to frustrate and defeat the will of 30th of August, 1904.  On the stand he said that he got up this deed to make assurance doubly sure.  He was after the lion's share.  Now, on

the 12th of September, three days before this confirmatory deed, he wrote his father, as is not denied, that he had just been fixing to come to see him, when a child took sick. The letter went on to say, "I have that deed made *to you* all right, and will have it recorded today. I have had it wrote some time, but never got a notary here, so Marg could sign it. I will be up as as soon as I can." This shows that his father had requested a reconveyance, and that George acceded to it; but lo, three days later, this reconveyance turns out to be one by which the old deed to George is approved and re-executed by his father. This goes to show, not only undue influence and fraud, but weakness of mind of the father. If competent, why would he consent to a deed confirming a deed which he had asked to be revoked? What the next act? In October, 1904, James H. Hinchman brought a suit against George Hinchman to cancel the two deeds which James H. Hinchman had made to him, alleging in his bill that George R. Hinchman had advised him to convey his land to him so that it could be better divided among his children, and promising to hold it for them all; and that he came with the deed of the 15th of September at night when the old man was sick in bed and that he executed the deed, being at the time so sick and feeble that he could not understand it, and that it was procured by fraud and misrepresentation. He alleged that he wanted all his children to share, and that George had promised to reconvey, as he could not make a division between the children, and that he, the father, thought he was only getting back his land by this deed. This is very likely. He made his son Joseph his attorney in fact to attend to all his business, and Joseph was active in the prosecution of this suit by producing witnesses and taking other steps in it. As witness the old man swore in a deposition in that suit as to the September deed that he thought it gave him his land back, as George had promised. A compromise was made of that suit and it was dismissed. It seems clear that by the compromise the land was to be conveyed back to James H. Hinchman and divided between the six children equally. By deed dated the 29th of May, 1905, George R. Hinchman conveyed the land back to his father, and by deed of the same date the father conveyed the same land to his two sons, George and Joseph Hinchman, the deed in controversy in this case. On June 23, 1905, the father James H. Hinchman made a will by

which he confirmed the deed which he had made to George and Joseph Hinchman of the 29th of May, 1905. If that deed was good, why this will? Did the sons fear as to its validity and desire their father to confirm it by will? The old man seems to have thought that he still owned the land and could devise it. A little later on, on the 27th day of July, 1905, James H. Hinchman made another will, which was probated. This will states that certain litigation between James H. Hinchman and George R. Hinchman had been compromised, and that the compromise was not carried out according to the agreement, and that it had come to his knowledge that a deed was on record purporting to have been made by him, James H. Hinchman, on the 29th of May, 1905, conveying all his real estate to Joseph W. Hinchman and George R. Hinchman; and that said deed was contrary to his wishes, because he desired a fair division made of all his property between all his heirs. This will then repudiated and rescinded the deed of May 29, 1905, as being no act of the testator. The will further recites that it had come to the knowledge of the testator that a will was in existence purporting to be made by him conveying all his real estate to Joseph W. Hinchman and George R. Hinchman, and stating this was contrary to his wishes. The will of 27th of July devises all his land equally among all his living children and the children of one dead. The old man seemed not to comprehend that he did not own the land; he seemed to think he could yet give it to his children impartially by will. Now may we not say that these acts of James H. Hinchman making inconsistent disposal of this land, giving by one act to George R. Hinchman, by another to his two sons, by another to his children equally, six of these inconsistent acts within sixteen months, show that he was incompetent? He does and undoes. These circumstances are strong to show that the old man was in second childhood. He was broken by age and disease and suffering. He was a mental wreck. He was plastic clay in the potter's hand. We can the more truly say this when we reflect that he did not write one of these papers, but they were brought to him by interested parties. It does not appear that he suggested or drew up or originated any of these inconsistent papers. It does not appear that he manifested any desire as to the disposition of his property other than a heartfelt desire that all his children should share equally. That was his only ruling purpose.

Those inconsistent papers go to show that James H. Hinchman in the dotage of age and weakness of body would yield to any child that would solicit his action. He had no force of will to resist. If not so, why would he yield to first one then another? The very fact that he was once a man of intellect lends strength to the statement that he was later an imbecile; for if he had not lost all his natural business capacity, we would not find him making such inconsistent papers, such disposition of his property. No man in his senses would do this. This charge of incompetency is sustained by the shocking injustice to his daughters from the deed involved in this suit. The land was about thirteen hundred acres in a fine coal region in Logan County, worth anywhere from thirty to fifty thousand dollars. The four daughters had never received anything from their father. That deed gave each of them only fifteen hundred dollars. The sons got the lion's share. Can we think that a man who had held responsible position, and of good character and principle, who is shown to have had a strong love for his children, would thus make rich men of two sons and give his daughters pittance? Any one reading a deposition given by James H. Hinchman a few months before the date of the deed must be struck with the fact that he was of very feeble mind. I cannot give the details of that deposition, but it shows great feebleness of mind. So much as to the want of capacity of James H. Hinchman to make the deed. As to Joseph W. Hinchman, he was an active prosecutor of that suit in the name of his father to set aside the two deeds made by his father to George R. Hinchman based on the charge of mental weakness of his father. By letters to his sisters he called upon them to fight George R. Hinchman in the suit to set aside those deeds. In letters to his sisters he did this, and denounced his brother as guilty of fraud, calling him a "sneak thief." He said in one letter that his father was "but a poor old feeble thing; he is a mental and physical reck & the man that would dare to take advantage of him how could I call him my brother." In a letter about the suit of his father against George R. Hinchman he said, "I have got pap fully awakened, but he is just like a little child, perfectly inactive, forgetful and indifferent. Have to tell him again today what I told him day before yesterday." He told several persons that owing to age and infirmity he was a mental wreck and incapable of transacting any business of importance,

and child like could be influenced to sign any paper, and said he would so state on oath. Such was Joseph's opinion as to his father's mental condition. So much as to the question of capacity of James H. Hinchman to make the deed. Now as to undue influence. The two brothers were men of mature age and seemed astute. They lived within less than a mile of their father's house. The old man transacted no business, but left it all to those two sons, particularly to George R. Hichman. The daughters lived in another county. They and their husbands seldom saw the old man, but those two sons were in almost daily intercourse with their father. George R. Hinchman cut a large amount of timber from his father's land and received the money therefor, and collected oil rental, and deposited the money in his own name in the bank. He did not turn it over to his father, and only paid him petty sums now and then. When his father sued him to set aside the two deeds above mentioned he also sued him in *assumpsit* for those moneys, claiming some five thousand dollars. All the evidence shows that the old man had confidence in these sons, committed all his business to them, and that they had unbounded influence over him. They could get him to make any paper they wished, as shown by the inconsistent papers above mentioned and other evidence. On Sunday, May 28, George and Joseph Hinchman went to their father's home. One of them came from Ohio, to which he had a few weeks before moved. Shortly before that, about the 5th of May, the two brothers had arranged a compromise of the suits to cancel the deed to George Hinchman, by which compromise George was to give up the land and it was to be divided equally among the six children. For such a result Joseph Hinchman had been struggling for months. On that Sunday a private conference took place between the father and those two sons. A grandson swears that one of the sons suggested to him that he and his wife then living with James H. Hinchman, visit a neighbor and leave the two sons with their father, as they had some business matters to talk over with him. The grandson and his wife did so. The two sons and their father had the conference to themselves. What did they say to the old man? We do not know. Did they tell him that on the next day the compromise would be carried out and thus misrepresent the character of the deed which the old man made next day? Did

they tell him that he was to get back his land and make a deed
of equal division among all the children? Or did they over-
ween him to consent to the deed of the next day giving all his
large estate to the two sons. That secret conference speaks
strongly in this case. It was on Sunday. The case was pressing.
It is not without force to remark that George and Joseph seemed
afraid to say whether they were there together. They say that
they cannot say as to this. Strange! But there they were.
George had a deed for all the land. The old man says George
made a proposition. What? There he was having all the land
in his clutch. He had received it in trust to divide among all the
children. Perhaps he said to his father, "If you will deed the
land to me and Joseph, I will surrender the land to you." He
had the land in his hand as a weapon of coercion. Both broth-
ers may have used it as a club to compel such deed. The old
weak man, thus coerced, was in *vinculis*, moved by undue influ-
ence. We do not deny the rule of *Delaplain* v. *Grubb*, 44 W.
Va. 612, that a man is presumed to be able to make a deed; we
do not say that Hinchman was incompetent to make a
free and voluntary deed; but old and weak as he was,
he was not free under the circumstance; that George
had his land and could dictate terms of surrender.
Anyhow, the next day is born a deed by which the old man gives
all his land worth from thirty thousand to fifty thousand dollars
then, and prospectively more, to his two sons. Joseph Hinch-
man who had been writing to his sisters that he was fighting for
equal division suddenly deserts them and becomes owner of half
himself and concedes the other half to his late antagonist. Sud-
den change this desertion of his allies. What is the reasonable
explanation? Confederacy and combination between the two
brothers to wrong the sisters, and defeat their father's cherished
object, equality between the children of his loins. What did
the aged man think the deed meant? Joseph had been made
by him, by power of attorney, his agent to transact his business.
Joseph had been fighting George to cancel the deed. They com-
promised. The father thought they had made peace; that Joseph
had succeeded in regaining his land. What more reasonable
than to say that he thought he was getting back his land, and dis-
tributing it after his death among all his children? How could
he think that Joseph, whom he had chosen to fight for his chil-

dren, was doing anything else? Why did the compromise perish so soon? It perished, as in thousands of instances, at the bidding of gain. Who believes, knowing that the father who wanted equality, would so suddenly change and sedately ˜cut off his daughters? In a will made in less than two months before his death, when he was nearing its portal, he denounced that deed, declaring that it was contrary to his wish, tried to carry out that wish by devise equal among all his children. Anybody reading this case must realize more clearly than I can express it, that the deed of 29th May, 1905, is the child of undue influence and fraud upon an old dying father. See the injustice it has done among children having equal claims. George Hinchman had received thousands of dollars from his father's money for timber and oil rental, for which he never accounted. He and his brother get $12,000. each, likely much more, in land. The sisters get $1,500, each, and out of this the hard deed makes them deduct certain costs. The boys indeed get the lion's share. We know that George R. Hinchman importuned his father to make a conveyance, as he told his father that if he intended to give him anything he wanted it at once, as life was uncertain. This demand resulted in the deed of 19th March, 1904, giving George all the land. He had his aim set all the time to secure the lion's share. I might detail other circumstances against this deed, but it is useless. We admit that if a party is capable, his wish is law; but there is no fixed rule; each case must stand on its own facts, and the facts in one case rarely govern another, says *Greer* v. *Greer,* 9 Grat. 330. There it is laid down as a rule that "Although the grantor or testator may labor under no legal incapacity to do a valid act or make a contract, yet if the whole transaction taken together with all the facts, mental weakness being one of them, shows that the particular act was not attended with the consent of his will and understanding, it is void." I find in Minor on Real Property, sec. 1164, the following in respect to unjust acts: "This class comprehends cases where advantage has been taken of the mental weakness, or of the necessities or actual condition of one of the contracting parties, putting him under the power of the other; or of undue influence arising out of the nature of the social relation in which the parties stand to each other; or of the business relations inconsistent for the time being with the transaction in question. Weakness of mind alone, where there

72 W. Va.

is a legal capacity for business, does not invalidate an instrument; but if connected with any circumstances of surprise, inadequate consideration, undue influence, or the like, it affords strong, and, in general, satisfactory proof of fraud. The question always is, whether the party has yielded an intelligent and willing consent to the transaction; and if it appear, considering all the facts—mental weakness being one—that such consent is wanting, the act is void." *Samuel* v. *Marshall,* 3 Leigh 567, lays down this principle, namely: "A person reduced to a state of mental imbecility by habitual intoxication, makes a voluntary and irrevocable deed of gift of his whole estate, to a cousin german, to the disherison of his half sisters, reserving the use to the donor for life, without any reasonable motive assigned for such an act; held fraud and imposition may be inferred from the circumstances, and from the very nature of the contract; and this deed of gift is fraudulent and void." *Hartman* v. *Strickler,* 82 Va. 238, tells us that when a will of an old man differs from his previously expressed intention, and in favor of those standing in relation of confidence, it raises a violent presumption of fraud and undue influence, which must be overcome by satisfactory testimony. Repeated in *Whitelaw* v. *Simms,* 90 Va. 588. This deed was prepared by Joseph Hinchman at his own home, not at his father's home, not in his presence. It was not read to him. These are important facts. The deed was handed to him while in or sitting on his bed. He was nearly blind. When asked if he understood it he remarked, "We have talked it over." But what the talk of the day before was we do not know. Perhaps he was told he was getting back his land, or making a division of it among his children. The notary who took his acknowledgment is clear that the deed was not read to the old man, but he had it in his hand as if reading it. A physician swears that he knew the old man could not read well. May we not ask, Why was not so important a deed read and explained to the frail old man?"

The fact that the execution of a will was kept secret from some of the children is often entitled to great consideration, in connection with evidence tending to show undue influence. "Thus where a testatrix was old and feeble, with a mind so impaired that she was easily influenced by those possessing her chief confidence, and her will was executed in the presence of one of her

children, who was greatly benefitted by it, the court regarded the secrecy of execution as a circumstance tending to establish undue influence." 31 Amer. St. R. 684. There we also see that when it is alleged that the instrument was procured by undue influence, or was made while its maker was not of disposing mind, the fact that its provisions are not in harmony with a free and rational mind, must always lend probability to the charge. It may happen, too, that the evidence discloses what were the affections and wishes of the testator but a short time before, and nothing has occurred to change them and the act is variant from them, the change must be explained; else it will show that his act was not that of a free and disposing mind. We know the old man's cherished intent of equality among his children. We see nothing to make him change it, except the pressure of his two sons to grasp the lion's share. Why should they get all?

In *Leonard* v. *Burtle,* 226 Ill., the syllabus is as follows: "Proof that the testatrix, who was old and feeble, reposed great confidence in her son, who acted as her agent, and that the latter procured his attorney to draw the will, and that the son and the attorney were alone with the testatrix at the drawing and execution of the will, which made the son practically the only beneficiary of a large estate, whereas the other children and grandchildren were given but small amounts, establishes *prima facie* the charge of undue influence by the son."

I quote from 1 Underhill on Wills 197, the following: "Thus if the testator is an old and feeble man, unable to devote his attention to the active management of his estate, and if he had for sometime prior to the execution of the will permitted the legatee to exercise an exclusive and complete control of all his property, the drawing of a will in his own favor by the confidential agent, to the total exclusion of the claims of members of the testator's family, would be a circumstance of the greatest suspicion; presumption of fraud and of undue influence would, in such a case, be almost irresistible. But it is still a presumption of fact and may be rebutted. The clearest evidence would be required from the proponent, extending much further than mere proof of due execution and acquaintance with the contents of the will." Pomeroy's Eq., sec. 947, says that when mental weakness and failure of memory are accompanied by other inequitable incidents, equity will annul the conveyance, and the burden, where

there is real weakness, is on the grantee to show "perfect fairness and capacity." Our own case of *McMechen* v. *McMechen*, 17 W. Va. 683, holds such principles where an interested party draws a will. See 31 Amer. St. R. 685. I do not intend to say that mere relationship affords a legal presumption of undue influence; but I do say that it is an important fact to be considered in connection with other circumstances of the case. I do not deny the principles laid down in *Delaplain* v. *Grubb,* 44 W. Va. 612, and *Buckey* v. *Buckey,* 38 W. Va. 168, and like cases, that a man is presumed to be competent at the *factum* of a deed; but each case stands on its own facts and circumstances, and I place the decision of this case on its facts and circumstances differing it from those cases. I draw a marked distinction between those cases and this. In them the parties making the instruments were active in having them prepared, whereas in this case the father did not do so, but the deeds were made ready in his absence by the beneficiary.

Our conclusion is to reverse and set aside the deed of the 29th of May, 1905, from James H. Hinchman to George R. Hinchman and Joseph W. Hinchman, and remand the case for other purposes contemplated by the bill.

*Reversed and Remanded.*

POFFENBARGER, JUDGE, *(concurring)*:

The rule announced by this Court in *Black* v. *Post,* 6 W. Va. 253; *Woodville* v. *Woodville,* 63 W. Va. 286; *Bade* v. *Feay,* 63 W. Va. 166; *Teter* v. *Teter,* 59 W. Va. 449; *Noffsinger* v. *Farnsworth,* 46 W. Va. 410; *Delaplain* v. *Grubb,* 44 W. Va. 612; and *Buckey* v. *Buckey,* 38 W. Va. 168, renders it very difficult to overthrow a deed or will for mental incompetency or undue influence or both. Tested by that rule, the grantor in the deed here assailed was clearly competent to execute a voluntary deed, and that rule will sustain this deed against many of the facts relied upon as proving the exercise of undue influence. But this case is distinguished from those referred to by two weighty circumstances, not found in any of them, numerous inconsistent dispositions indicative of defective mentality respecting the disposition of property by gift, and contemporaneous possession of the title to the property by one of the grantees naturally and necessarily working restraint and control of the will, wishes and

power of the grantor. As to his property, he was not a free agent, because it was already out of his ownership and beyond his control, and in the hands of the son as a weapon of coercion. At the date of the deed of May 29, 1905, and the execution thereof, father and sons did not stand at arm's length and on an equal footing. The aged and feeble father was not then in law the owner of his very considerable estate, nor in a position to do with it as he pleased. One of the sons had previously gotten the title thereto in himself and the father was then endeavoring to regain it. Mentally and physically unable personally to conduct the litigation necessary to reclamation, he had entrusted this important business to his other son. When both sons appeared, recommending a compromise, a relinquishment of at least one-half of the land and all the money in controversy, we may well suppose the father felt still more deeply his helpless position.

The deed, making flagrantly unequal distribution of the estate, corresponds in character with the untoward circumstances under which it was made. On the face of the transaction, we perceive the natural relation of cause and effect, calling for a satisfactory explanation. The circumstances shift the burden of proof to the shoulders of the grantees, under a well settled equity principle. A mortgagee or other person having in his hands the title to another's property as a security or for some other special purpose, and obtaining an absolute conveyance or acquittance as to the equity of redemption in some form, must show he obtained it fairly. *Liskey* v. *Snyder,* 56 W. Va. 610. Though the element of purchase is not involved here, the principle applies, for the advantage of the grantee over the grantor, the inequality of footing, giving rise to the presumption of unfairness in the class of cases referred to, is present and presumptively operative. This rule applies in cases of admitted competency on the part of the grantor. This circumstance, regarded in equity as a coercive influence strong enough to overpower the will of men in full possession of mental vigor and power, may well be supposed to doubly influence the aged, afflicted, deserted and mentally weak.

Under such circumstances, these two sons were under a duty, in securing a conveyance of their father's estate, to proceed in such manner as to place their good faith in the transaction beyond question and leave no doubt as to the grantor's full knowl-

edge of the purpose and character of the conveyance and his full, free and deliberate choice in the matter of the disposition of his property by gift.

The unusual and anomalous character of the transaction here involved becomes manifest when the attendant circumstances are compared with those under which testamentary gifts are generally made. Ordinarily the donor has full and unquestioned dominion and his will, not that of the donee, is dominant, controling and has free course. Here the donor legally had nothing in his power to give. It was already in the hands of one of the donees. The latter, not the real owner, was master of the situation, and the former an antagonist or suppliant.

If the record can be said to disclose any effort to show the fairness of the transaction, it is abortive. The two sons went to the father in secret and pre-arranged some sort of an understanding as to a deed. Then one of them prepared it, not in the presence and under the direction of the donor, but at his own home some distance away. It was not read and explained to the grantor. Nobody was present when he signed it except the two sons and the notary who took his acknowledgment. They say he had the deed in his hands as if reading it, but do not say he actually read it. Under the circumstances, it ought to appear not only that he read it or that it was read to him, but also that it was fully explained to him and the question of his comprehension of the full meaning and import thereof placed beyond the shadow of a doubt.

The claim of an equity in the two sons, conforming to the character and effect of the deed, is founded upon transactions dating back to the year 1871, more than 30 years prior to the date of the deed. This is the old deed found among the grantor's papers indicating intent at the time of its execution, to convey the land to the two sons in consideration of love and affection and covenants of maintenance of the grantor and his wife during their natural lives. It is claimed this deed was actually delivered and then lost and that it was made partly in consideration of indebtedness of the grantor to be paid by the two sons. If there was such indebtedness and they paid it, and the delivery of the deed was postponed pending the discharge of the indebtedness, they were no doubt entitled to a delivery thereof within 10 or 15 years after the date of the deed. Or, if it was delivered and then

lost 15 or 20 years before the date of the deed in question here, there is no evidence of any effort to procure a new deed, and it is highly improbable that these two men, entitled to a valuable estate, would remain silent for so long a period, with knowledge of the non-delivery or loss of their muniment of title. The facts and circumstances are inconsistent with the theory of reliance upon an equitable title to the land or title under the lost deed. The evidence of this claim is obviously lacking in certainty and directness.

WILLIAMS, JUDGE, *(dissenting)*:

I think the decision of this case clearly wrong, if former decisions by this Court of similar cases are to have any weight as precedents. I think the evidence in the case of *Teter* v. *Teter,* 59 W. Va. 449, and *Black* v. *Post,* 67 W. Va. 253, and others I might name, make much stronger cases against the validity of the deeds thereby assailed than appellants have made in the present case, and yet, in those cases, this court held that the evidence was not sufficient to overthrow the deeds.

The law presumes the grantor was competent, and that his deed was made without undue influence or fraud, and imposes the burden upon plaintiffs, who have assailed it, to overcome those presumptions by proof. I do not think the proof, in the present case, is sufficient to overcome either of the presumptions. On the question of competency, I think the testimony of Mr. Hinchman himself, taken to be read as evidence in the suit then pending against his son, George, and the testimony of persons who had dealings with Mr. Hinchman, not very remote from the time the deed in question was made, is the most valuable evidence in the case on that point. True, Mr. Hinchman was enfeebled by disease and age, and at times was forgetful. Loss of memory is common to old age. But I cannot doubt that he then well knew the property which he was conveying, and the persons to whom he was conveying it, and also knew the legal effect of his deed. That knowledge is sufficient to satisfy the legal requirement as to capacity. That he was physically weak, does not prove that his mind was so impaired that he did not know what he was doing. A sample of his own testimony, taken in March 1905, about two months before the deed in controversy was made, will best illustrate the state of the old gentleman's mind at that time:

"Q. State your age, residence and occupation? Ans. I was 87 years old the 4th day of last January, Logan County, West Virginia. My occupation now is sitting around the fire. Q. Are you the plaintiff in this suit? Ans. Yes sir. Q. How many children have you living? Ans. Four. Q. How many dead that have living heirs? Ans. Two. Q. What relation are you to the defendant? Ans. I am sorry to tell you that I am his father."

He had been a man of more than ordinary mind, he had served as clerk of the court of his county for a number of years, and had represented his county in the state legislature, and, not more than four or five years before his death, he served as secretary to the board of education of his school district. Mr. Curry, the assessor, visited him on the 9th or 10th of April, only five or six weeks before the deed was made, and he states that Mr. Hinchman gave him a list of his property on that occasion. Millard Stafford, his grandson, and Millard's wife, were living with him at the time. They both testified as plaintiffs' witnesses, and their testimony, I think, proves his capacity, beyond question. None of the witnesses were experts, and their mere opinions concerning his capacity are of little value. The witnesses who have given opinions as to his competency are about equal in number, pro and con. The state of the old man's mind can be best judged by what he said and did, at the time, and near the time, when the deed was executed. Millard Stafford and his wife had been living with him about six months, and Millard says that his sons, Joe and George, came to see their father on Sunday, the day before the deed was executed; that Joseph told witness that he and George wanted to have a talk with their father about the suit which he then had against George, and which Joseph was seeking to have settled; that he had better take his wife and go over to Huse Ellis'; that he and his wife did go to Ellis', and returned that evening about four o'clock and found Joe and George still there. But before Millard and his wife left the house, the old gentleman was seized with a severe pain, and Millard and George helped him to bed. He was suffering with *arteriosclerosis* which, at times, would give him violent pain, and, after the pain would pass off, he would then be able to be up, and go about the house, and it would be sometime before an-

other attack. True, Millard Stafford gives it, as his opinion, that the old man was not capable of making a deed. But the following facts, and conversations with him, related by Millard as having taken place on the day before, and on the same day on which the deed was made, are worth more to prove competency than the mere opinions of all the witnesses who have testified in the case. They are facts which are like figures, and from such facts the court can reach its own conclusion. He says: "grandpap was sitting at the kitchen window, and he said he didn't believe that George was going to do what he promised to do, and that he was going back on him. I asked him what he promised to do, and he said 'I made a proposition to him yesterday evening, and it was for him to deed me back the land as it was, and George took me up on the first proposition.'" Stafford further says, that at noon, on the following day, the old man told him "that George had done what he promised to do and that he had deeded his land back to him and taken the deed to be put on record for him." Continuing, this witness also says that, on the same day, and only a short while after the foregoing statement was made to him by his grandfather, he went down to his uncle Joe's, and his uncle Joe told him how the matter had been fixed up, and that was altogether different from what his grandfather had told him. Now, if Stafford's evidence proves anything, it proves that the old man was capable of making his son George some kind of a proposition respecting the settlement of the pending law suit between them. Moreover, it proves that he was capable of recollecting it on the next day after it was made. Does not that prove capacity? I think it does. I will again refer to this bit of testimony, a little later on, in relation to its bearing on the question of fraud and undue influence. Can anyone for an instant, believe that was the whole of the understanding or agreement between George and his father? Certainly not, it is altogether unilateral. But it is very reasonable to believe that it was all of it that was told to Stafford. The old man had reason to keep the part which he was to perform to himself.

Helen Stafford, Millard's wife, says that, at times, the old man "seemed that he wasn't exactly right in his mind." She also says, that on the day before the deed was made he was not well, "but on that day (May 29, 1905) he seemed pretty pert." Now, taking the testimony of these two witnesses together, it proves

that, on May 28th, the day on which he was seized with severe pains, and therefore less capable of transacting business than when not suffering physically, he was capable of submitting to his son George a proposition whereby the pending suit was to be settled and was capable on the next day of recollecting it, and of expressing a fear that George would not comply with his promise to carry it out. If he had capacity to do that on the 28th, does it not show sufficient capacity to execute a deed, and would he not have even greater capacity on the next day, when he was not suffering so much pain, but was able to be out of bed and to occupy a seat by the kitchen window? I have no doubt that he had all the capacity the law requires a grantor to have in order to make a good deed. It is proven by facts, not opinions of biased, non-expert witnesses, and the proof is established by plaintiffs' own witnesses. That he thereafter made wills, inconsistent with his deed, proves nothing as to capacity. It only proves that he afterwards changed his mind. He was very old and no doubt childish, a condition common to most persons who live to so great an age, and I have no doubt he was influenced to change his mind on account of the importunities of plaintiffs, or at least of some of them, who were less favored by the deed than the two sons. That the deed made an unequal distribution among his children proves nothing as to capacity, nor can it properly be said to savor of injustice. The property was old man Hinchman's, and he had a right to do what he pleased with it. It is a common occurrence, in making disposition of their property, for parents to make an unequal division of it among their children. We do not know what may have influenced Mr. Hinchman to do so, and we have no cause to inquire into his motive for giving his sons the lion's share. The law justifies his deed, if he was competent to make it, and was not deceived.

Is the charge of fraud and undue influence sustained? I think not. Giving all the evidence that appears in the case the greatest force to which it is legally entitled on this point, it proves no more than that the two sons had an opportunity to commit a fraud, had they been so disposed. But we held in *Black* v. *Post,* 67 W. Va. 253, that fraud could not be inferred from mere opportunity to commit it. Should we infer that fraud was actually committed, because the sons asked Stafford and his wife to visit a neighbor nearby, in order to give them an opportunity to ad-

just a matter of business, and settle a bitterly contested law suit between the father and one of the sons, in which the other son was acting as attorney in fact for the father? I think not. It is perfectly natural and reasonable that they should want to transact such business in private. Important business is usually transacted in private. Again, is it at all probable that Joe Hinchman would have told Millard Stafford on the same day, and almost immediately after, the deed had been executed, exactly how the business had been settled, if he and his brother George had, in fact, practiced a fraud on their old father? It is unreasonable to think so. It is a circumstance which, to my mind, is more consistent with square dealing than with fraud. Instead of proving that the old man submitted to his son George a proposition, on the 28th, which he accepted, and agreed to consummate on the 29th, but that, instead of carrying it out, he united with his brother Joe in the fraudulent consummation of a wholly different arrangement, Millard Stafford's testimony tends to prove the contrary. That which the old man told Stafford was to be done harmonizes with the presumed fairness of what was done. Stafford does not say that his grandfather told him *all* that was embraced in the proposition that he submitted to George, and even if he had told him all that had passed between him and George, and it had afterwards turned out differently, it would not be sufficient to prove fraud. Because the old man might very reasonably have agreed to a different proposition when he and George met. But Stafford's testimony does not prove that a proposition, different from the one which the old man had made to George, was actually carried into the deed. He says the old man told him that George had agreed to deed the land back to him, but he does not say that he told him what he, the old man, had agreed to do with it after he got it. So much of the agreement as the old man told him George was to perform, was in fact performed, but what the old man was to do was not apparently made known to Stafford. So that, what the old man told him George had agreed to do, is altogether consistent with what his uncle Joe told him had actually been done. George did reconvey to him the land, just as the old man said he had agreed to do. But is it unreasonable to suppose that the old man purposely withheld from his grandson information respecting the disposition which he was to make of the land after it was re-

conveyed to him? I think not, because he knew it would cause dissatisfaction among his other children, as soon as it became known to them. Again, if the sons had planned to deceive their father, why did they not send Stafford and his wife away from the house on the day the alleged fraud was consummated, rather than on the day before, when the agreement was made? They were at home on the 29th of May.

In 1904, the old man had conveyed all his land to his son George, and there was a bitterly contested suit then pending to have the deed set saide, and depositions of many witnesses had been taken. It was a doubtful contest, and no one could anticipate the outcome of it. Now, does it comport with good reason to say, that George had consented to surrender that contest and reconvey all the land to his father, for no other consideration than that he should receive an equal share in the land with the other children? I think not. He knew he would certainly get that much by inheritance, in case the deed should be declared void. Because, if the old man was incapable of disposing of his property by making an unequal division of it in George's favor, he was equally incapable of making any kind of disposition of it, either by deed or will, which could operate to defeat his inheritance.

The previously expressed intention of the old man, to make all his children equal in the distribution of his property, is not evidence to defeat his deed. His intentions may have changed, and the execution of the deed is the best possible evidence that he did change his mind, if, in fact, he ever intended to make them equal. That Mr. Hinchman was easily influenced, and could have been unduly influenced by the persuasions of his two sons, does not prove that he was, in fact, unduly influenced by them to make the deed. We repeat, the law does not infer fraud from mere opportunity to commit it. The proof in this case rises no higher than to show opportunity to commit fraud.

Two deeds were executed on the 29th, one to Mr. Hinchman and the other by him. One was acknowledged by him and the other by his son George. The notary testifies that, while he was writing out the certificate of George's acknowledgment, the old man was looking over the other deed. He was an intelligent man, and the presumption is that he read it. It is not necessary that it should have been read to him. Again, if the sons were

engaged in a game of fraud, it is not to be presumed that they took the notary into their confidence; neither is it reasonable to suppose that they would have undertaken it in his presence. There was too much risk of its discovery.

Much probative force seems to be given, in the majority opinion, to the letters written by Joe to his sisters, pending the suit between the old man and George, concerning the view Joe then had as to the old man's mental condition, and also as showing deception and fraud on his part. His conduct, in that regard, was certainly not commendable, nor even excusable. But he was then seeking to enlist the sympathy and assistance of his sisters, in a suit against George, which he was prosecuting under power of attorney from his father. The old man was then living, and none of his children had any kind of interest in his lands of which they could be defrauded. While the old man lived they could have no estate in his land. And, even if Joe did deceive his sisters, it does not prove that he deceived his father into making the deed. But whatever effect Joe's conduct might have, as proof of his own bad faith, it cannot be read as evidence against George. It was a transaction between other parties, and the familiar maxim, *res inter alios acta alteri nocere non debet,* applies.

I am clearly of the opinion that the evidence is wholly insufficient to overcome the legal presumptions, that James H. Hinchman was capable of executing the deed, and that its execution was unattended with fraud. On the contrary, every fact proven, in relation to the execution of the deed, is perfectly consistent with fair dealing. It became known as soon as the deed was made, how the old man had disposed of his property; he lived for nearly four months thereafter, and plaintiff made no effort to take and preserve his testimony.

In conclusion, it appears that the suit of James H. Hinchman against George Hinchman was settled and dismissed, in consideration of the deed which the majority opinion holds to be void. Is it not exceedingly unfair to George Hinchman to declare this deed void, and not restore him to his rights as they were before that suit was dismissed? The parties should be placed in *statu quo,* but how can that be done? Is there not great danger that the decision of this Court may operate to do him an irreparable injustice? I would affirm the decree.

ROBINSON, JUDGE, *(dissenting)*:

The decision of the majority meets an emphatic, but respectful, dissent on my part. It is totally at variance with principles enunciated in *Buckey* v. *Buckey,* 38 W. Va. 168; *Delaplain* v. *Grubb,* 44 W. Va. 613; *Farnsworth* v. *Noffsinger,* 46 W. Va. 410; *Teter* v. *Teter,* 59 W. Va. 253; *Woodville* v. *Woodville,* 63 W. Va. 286; *Black* v. *Post,* 67 W. Va. 253, and other cases. The evidence in the case does not overthrow the presumption in favor of the mental competency of the grantor in the deed. Nor does it successfully assail the deed as one secured through fraud or undue influence. It is useless to mention significant features of the testimony not discussed in the majority opinion. To say the least, the evidence is conflicting along every line. Different minds might draw different conclusions from it. An able and cautious chancellor has passed on it. A well known and salutary rule forbids that his finding and the decree made thereon be overthrown.