M. E. COULTER *v.* GLEN O. COULTER

(No. 9663)

Submitted April 24, 1945. Decided May 29, 1945.

*Duffield & Hyer* and *Hines & Davis,* for appellant.
*G. C. Belknap* and *Van B. Hall,* for appellee.

KENNA, JUDGE:

This chancery proceeding was instituted in the Circuit Court of Braxton County by M. E. Coulter against Glen O. Coulter, one of her sons, for the purpose of setting aside a

deed executed by the complainant to the defendant conveying seventy-five acres of land situate on Leatherwood Run in Birch District upon which stood the home in which the defendant had been reared by his mother. The prayer and allegations of the bill of complaint include as ground for relief, fraud, inadequacy of consideration, and the averment that the instrument under attack is not, in fact, the complainant's act and deed. The respondent filed an answer that denies the allegations of the bill of complaint, generally and in detail, so far as they affect the complainant's alleged right to relief. Testimony of both sides was taken in open court, after which a decree was entered deciding the material issues of fact favorably to the contentions of the complainant and granting the relief sought. This Court granted an appeal from that decree in response to the prayer of a petition assigning five separate points of error, all of which go either to the sufficiency of the evidence taken to sustain the decree entered or to the weight to be attached to certain evidence. The assignments, we believe, can be covered by a general discussion of the whole evidence without separating them numerically.

In nineteen hundred and twenty-one, before the death of complainant's husband, George Coulter, and while his and complainant's three sons, Glen, Hilly and Grover, were unmarried and in their young manhood, there was conveyed to complainant one hundred and seventy-six acres on Leatherwood Run, upon which she, her husband and sons, immediately moved, occupying its principal dwelling, there being two residences upon the tract conveyed. In nineteen hundred and twenty-seven Glen, the defendant, married, and he and his wife, Madge, moved into the smaller house on the home place.

It would seem that the Coulters encountered difficulty in paying for the farm, so that in nineteen hundred and twenty-nine they sold sixty acres in order to pay the purchase debt, it then having been converted into a different form. After this Grover moved to a midwestern city, and

Hilly married and lived in the neighborhood of the Coulter farm.

Glen, being the only son who remained on the farm, helped considerably in its maintenance, his father being quite elderly and unable to perform manual labor to a substantial degree. There is conflict on the question of the extent to which Glen was compensated, if at all. In nineteen hundred and thirty-four the father's health had failed to an extent that required his commitment to a hospital in Philippi, and Mrs. Coulter spent several days there. At about the same time Glen and his wife moved into the Coulter dwelling, they say at her invitation, and the complainant testifies that it occurred without her knowledge and while she was in Philippi assisting in caring for her husband. Mr. Coulter died in the fall of nineteen hundred and thirty-four, a day after his return from Philippi and a few days after Glen and his wife had moved to the Coulter home. There are few direct conflicts in the testimony to this point, but from here on the conflicts become decidedly more pronounced and numerous.

On February twelfth, nineteen hundred and forty-one, the day on which the purported execution and acknowledgment of the deed in controversy took place, Mrs. M. E. Coulter, who could not read nor write, and who was then seventy-four years old, admittedly was suffering from a serious attack of influenza, although there are contradictions as to whether she was altogether bedridden on that day.

Glen Coulter arranged with a Dr. Norman Goad, whose office was located at Strange Creek, an unincorporated hamlet several miles farther from the Coulter farm than Sutton, to visit Mrs. Coulter at around two o'clock in the afternoon of February twelfth. This was the only occasion during her illness, which apparently lasted between four and six weeks, that Dr. Goad called on her, although he had treated her from time to time for a number of years. Dr. Goad testifies that, according to his best recollection, Mrs. Coulter was not in bed, but was alternately in a chair and on a couch during his visit; that she responded to his

questions intelligently; and that although "she was rather bad off", in his opinion she was capable of knowing and understanding the effect of the deed in question. He was not asked whether Glen had had him examine his mother for the purpose of reaching a conclusion on that question, nor whether he had told Glen his opinion before the time Glen testified that the deed was executed.

When Dr. Goad left the farm in his car, Glen went with him as far as Frametown, another unincorporated town farther from the farm than Sutton on State Route 4 between Lost Creek and the Coulter place. He there met a notary public who had agreed to go to the farm, Glen having told him, according to the Notary, that "his mother wanted me to come over and do some Notary work for her." It does not appear who paid the notary for his trouble nor how much he received. He and Glen arrived at the Coulter farm at about four o'clock in the afternoon. Upon arriving, the notary went to Mrs. Coulter's bedroom and found her in bed, with a Mrs. McLaughlin and Glen's wife in the room. He says that Mrs. Coulter asked Mrs. McLaughlin to leave, and that he does not recollect whether Glen's wife left with her or not, but that Glen came to the room a few minutes later with the deed, which the notary public did not then know was a deed, in his possession. It was not placed in the possession of Mrs. Coulter in the notary's presence at any time. The notary states that he asked her if she had read the deed, her inability to read apparently being unknown to him, although he states that he had known her for over twenty years. Her reply was that she had had it read to her, and it was "the way she wanted it". Glen, who was accustomed to signing papers for his mother, wrote the name of M. E. Coulter in the space intended for that purpose at the bottom of the deed and the notary states that then "I held the pen at the bottom and she helt the top of it and made her mark." The notary states that he took the acknowledgment in question. He neither read the instrument nor explained its contents to Mrs. Coulter. It is certain that he and Glen were in the room with Mrs. Coulter when

her name was affixed and her mark made, and, unless Glen's wife was also present, that there were no others.

Glen Coulter testified that his mother was in good mental condition when her name and mark were placed on the deed and she acknowledged it in the presence of no one but himself and the notary public. He testified also that a short time after the death of his father in nineteen hundred and thirty-six his mother had a deed prepared the effect of which would have been to convey to him, Glen, the same boundary of seventy-five acres as that described in the deed in controversy, and that the attorney in Sutton who prepared the deed at his mother's request added, without his mother's knowledge, a covenant obliging the grantee to support and maintain the grantor for life. Glen Coulter testified that when his mother found that provision in the deed she declined to execute it. Mrs. Coulter says that when Glen found that provision in the deed he would not accept it, and that his attitude changed her mind concerning the conveyance. The draft in question was not used.

Glen Coulter's wife agrees substantially with his testimony, admits that her relations with Mrs. Coulter were quite disturbed, and that on two occasions she struck plaintiff. Mrs. Glen Coulter was thirty-six years of age when she testified, the complainant being forty-one years older.

It appears that the deed in controversy was prepared by a Sutton attorney on the fourth day of January, nineteen hundred and forty-one, and sent by mail to Glen, who received it at the farm the next day. Glen testified that he, the grantee, read the deed to his mother upon receiving it at the Coulter farm. That is the only information that the defendant claims his mother had concerning its contents when, as he contends, she executed it on the twelfth day of February, nineteen hundred and forty-one.

It does not appear from this record who caused the survey or protraction to be made upon which the description contained in the deed was based, but since it is what is commonly called "an outsale", with a description by metes

and bounds of the land conveyed, it is likely that a survey was made. Neither does it plainly appear from where the description used in the deed in controversy was obtained, but it is established that the description is identical with that in the unused deed of nineteen hundred and thirty-six. The principal difference in the two instruments seems to have been the omission of the covenant to support and maintain the grantor during life, and basing the consideration for the deed of February twelfth, nineteen hundred and forty-one, upon natural love and affection, accompanied by the usual recital of one dollar cash in hand paid.

The testimony of the plaintiff is that she executed no instrument conveying any part of the farm to Glen Coulter at a time when she was capable of realizing the effect of doing so, and that she had no knowledge that Glen claimed ownership of the Coulter farm until sometime immediately prior to the institution of this case in 1943, approximately two years after the date of the deed under attack, when she and Madge Coulter, Glen's wife, had "a fuss" during which Glen's wife told her that she, Mrs. Coulter, was living on their place and that if she did not believe so to go to Sutton, look at the records and find out. This Mrs. Coulter promptly did, and, according to her testimony, then learned for the first time, by an examination of the public records, that her son, Glen, was claiming ownership of a part of the Coulter farm. Mrs. Coulter's testimony lacks exactness concerning what took place on February twelfth and a number of other occurrences. She was then seventy-four years of age. She simply states that she never "deeded" seventy-five acres of her farm to Glen Coulter, and that she was quite ill during January and February, nineteen hundred and forty-one, and has little, if any, recollection of what occurred during that time. She denies having told Glen to have the deed recorded, but to request the County Clerk not to release that fact for publication as it might influence Hilly, two of whose notes she had indorsed, not to pay the indebtedness they represented.

Eddie James testified that he went to see Mrs. Coulter three or four times during the month of February, his visits having been about one week apart, and that on each occasion Mrs. Coulter, in his opinion, was not in a mental condition to transact business; that he believed she did not recognize him or his wife; and that her replies to comments and questions, when she did reply, did not "make sense".

Mrs. Eddie James testified that she visited Mrs. Coulter several times during her illness and found her quite sick, drowsy, and frequently flighty, although occasionally she would talk and that "her mind seemed pretty good sometimes".

Grover Coulter testified that in August, nineteen hundred and forty-three, when he was visiting the farm from Ohio, where he was then located, Glen Coulter had told him that he, Glen, had a deed for seventy-five acres of the farm that he was holding for his mother. This Glen denies.

George William Coulter, a nephew of Glen Coulter and a grandson of Mrs. Coulter, testified that in a conversation with Glen Coulter a year and a half or two years before the taking of his testimony in January, nineteen hundred and forty-four, Glen had told him that he believed Mrs. Coulter was going crazy and that something would have to be done with her. This Glen Coulter denies, although his answer alleges that about a year after the execution of the deed she at times did things that caused him "to inquire of her mental condition".

Dr. J. C. Eakle testified that he visited Mrs. Coulter on the occasion of her illness in the winter of nineteen hundred and forty-one, when she was suffering from a fairly-severe attack of influenza; that he has no distinct recollection of her mental condition, but that influenza, with temperature, is, at times, accompained by irrationality, particularly in the case of aged persons.

We have attempted to state only the general purport of the testimony on both sides and not to detail the evidence even in so far as it concerns the material issues. The trial chancellor's liberal attitude permitted the intro-

duction of proof, a considerable part of which we believe, on appeal, is to be regarded as inconsequential.

It is contended on behalf of the appellee that the mental capacity to effectively execute an instrument is confined to the time of its execution, and that there is no evidence in this record that shows the complainant at that time lacked capacity. It is, of course, true that the faculties necessary to enter into a legally binding agreement are required to be possessed by the parties at the exact time of its being entered into, or, perhaps more accurately, long enough before its execution and at its execution to permit the person concerned to form a comprehension of its legal effect. However, the lack of comprehension or capacity is not required to be shown entirely by direct evidence. To the contrary, there are circumstances, as here, which, if clearly proven, may cause the absence of direct and unbiased testimony to be at least partially convincing; the presence of only the grantee and a friendly notary, together with perhaps the grantee's wife, at the time the deed is supposed to have been executed; the fact that the grantee went several miles beyond the near town of Sutton to get the doctor whom he had examine his mother immediately before her supposed acknowledgment before a notary who also lived several miles farther than the town of Sutton from the Coulter farm; and the fact that the only information concerning the deed's contents the seventy-four year old illiterate, sick grantor had was that which the grantee read to her more than thirty days before the date of the certificate of acknowledgment.

In this State a notary public is a *quasi* judicial officer, and as such is to be held partly responsible for the identity and capacity of the persons who request him to act officially. Otherwise his stamp of approval would not be considered closely kin to a verity. A notary's certificate, however, does not make the execution flawless. An act certified by a notary public as an acknowledgment must be by a person whom the notary believes to be capable of acting, in years, mental capacity, freedom from coer-

cion, et cetera. Otherwise, it is the plain duty of the notary to decline to certify.

Cases of this nature turn for decision largely upon the circumstances surrounding the execution of the instrument being considered. Consequently there is little applicable authority, and citations with or without a lengthy statement of facts help little.

The West Virginia case most closely akin to the case under consideration seems to be that of Curtis v. Curtis, 85 W. Va. 37, 100 S. E. 856, 8 A. L. R. 1091, the principal distinction appearing to be that in the Curtis case the incapacity of the mother, Katherine E. Smith, was permanent and progressive, while here that of Mrs. Coulter was temporary and brought about by her attack of influenza, during which her mark was made and allegedly acknowledged upon the deed under attack. Consequently the evidence in this case requires a more careful scrutiny in point of time than that in the Curtis case. Mrs. Coulter is not able to read and write and Mrs. Smith was. The Curtis case was between claimants under the signer; here the grantor sues in proper person. See also Turner v. Hinchman, 72 W. Va. 384, 79 S. E. 18, in which opinions were prepared by Judges Brannon, Poffenbarger, Williams and Robinson, and Doak, Admr. v. Smith, 93 W. Va. 133, 116 S. E. 691.

This Court has not drawn a distinction between decrees based upon proof taken by depositions and those in which the proof was taken, as here, before the trial chancellor in chambers, as has the Virginia court. See Morison v. Dominion National Bank, 169 Va. 191, 192 S. E. 707, 712. Our clear-cut rule now is to the effect that a decree sought to be reversed solely upon a finding of fact will be affirmed unless contrary to a plain preponderance of the evidence. Fisher v. Berwind-White Coal Mining Co., 64 W. Va. 304, 61 S. E. 910, 131 Am. St. Rep. 898; Bradshaw v. Farnsworth, 65 W. Va. 28, 63 S. E. 755. Being of the opinion that the evidence amply sustains the finding of the trial chancellor that at the time the defendant contends M. E. Coulter executed and delivered to him the

deed under attack she lacked the mental capacity to realize the effect of its execution and delivery, the decree of the Circuit Court of Braxton County is affirmed.

This case is to be distinguished from that of *W. M. Ellison, Admr., et al.* v. *Edna Lockard,* 127 W. Va. 611, 34 S. E. 2d 357, (recently decided) by the fact that in that case the grantor had died intestate and the attack was made by an heir at law: here the grantor in proper person institutes the attack and testifies that the physical act of executing the deed made no impression upon her consciousness.

*Affirmed.*