# CHARLESTON.

BARNETT, *Committee,* v. GREATHOUSE *et al.*

Submitted January 25, 1916.          Decided February 1, 1916.

DEEDS—*Burden of Proof—Undue Influence—Want of Mental Capacity—Consideration.*

> Upon the issues and facts herein, the object of the suit being cancellation of a deed and lease for alleged want of mental capacity in the grantor and lessor, want of consideration, fraud, and undue influence, this case is controlled by *Delaplain* v. *Grubb,* 44 W. Va. 612; *Teter* v. *Teter,* 59 W. Va. 449; *Woodville* v. *Woodville,* 63 W. Va. 286; and *Black* v. *Post,* 67 W. Va. 253.

Appeal from Circuit Court, Doddridge County.

Suit by L. H. Barnett, committee, etc., against G. G. Greathouse and others. From decree for plaintiff, certain defendants appeal.

*Reversed, and bill dismissed.*

*J. V. Blair* and *A. F. McCue,* for appellants.

*R. F. Kidd. Linn & Byrne* and *G. W. Farr,* for appellee.

LYNCH, JUDGE:

By the bill in this cause is assailed a deed made by Pinkard Brannon, January 2, 1912, to B. G. Greathouse and three others, and cancellation thereof prayed, on the grounds of mental incapacity of the grantor, fraud and undue influence by the grantees, and want of consideration therefor; and also, on the same and other grounds, a lease contract dated April 29, 1904, for the land conveyed by the deed, made by Brannon to B. G. Greathouse, the lease to extend eight years after the death of the lessor. The plaintiff is L. H. Barnett, the committee appointed for Brannon by the county court of Gilmer county on January 30, 1912. On final hearing, the circuit

court cancelled the deed and contract; and the case is now here for review on an appeal awarded defendants.

From the averments of the bill and the proof taken and filed, Brannon appears to have been an active and prudent business man, a farmer, and had acquired a large land acreage, consisting of several tracts, located in Doddridge and Gilmer counties, besides an interest bearing bank certificate of deposit of $5000 and about $1300 subject to check and other smaller items of personal property. Of the lands so owned by him, containing from 800 to 1000 acres, the deed conveyed only 199 acres.

Of the children born to the grantor and his wife, the only information disclosed by the record is that two of them have died; one, a daughter, resided with her father in Gilmer county, another on his lands nearby, and until recently a third out of the state. All the grantees, at and prior to the execution of the deed to them therefor, lived on the 199 acres. Of the three boys, it seems to be conceded that Pinkard Brannon was the father; Melissa Greathouse, the other grantee, was the mother of one and her sister Mary (now dead) of the other two male grantees, Melissa and Mary being the legitimate daughters of Catherine Greathouse. Indeed, the evidence, though somewhat meager, sufficiently shows such relation by him to the grantees and recognition of a moral obligation on his part to make some provision for their maintenance and support. With them he associated more than with those born to him in the marital relation. They occupied and for him cleared and tilled parts of his lands, taking unto themselves with his permission the usufruct under lease contracts with him. Apparently, they were frequently in attendance upon him, and, probably at his solicitation or request, accompanied him when transacting business at the banks or stores and elsewhere. He often spent much time at their residence. Of his own accord, it appears, he selected the home of Catherine Greathouse, mother of Melissa and grandmother of the other grantees, as the place to execute the grant to them.

But the existence of this geniality and intimacy does not alone prove undue influence on the part of the grantees. Brannon may have deemed them more loyal to him than those of his own household. His social relations with the latter are

not proved to have been intimate. He may have thought them negligent in their treatment toward him. Nor is it shown by any direct proof that the grantees suggested or induced the execution of the deed, or for that purpose solicited the intervention of an intermediary between them and the grantor. Its procurement is charged to C. F. Law, and against him is directed the main assault as the source of the influence used to procure the conveyance.

While it is true he and Brannon were friends, and perhaps as such each of them was cognizant of the business dealings of the other, by no convincing proof is it rendered certain Law did anything tending to persuade Brannon to convey the land to the grantees. Law wrote the deed, but not until Brannon requested him to do so and had become impatient because of delay in its preparation and had directed him to proceed at once and have it ready for execution at the time and place designated by him, if uncontradicted and indirectly partially corroborated testimony of Law is entitled to credence. But it is insisted that, as Law had a contract with Brannon for the timber on other lands owned by him, at an alleged inadequate price, he had some ulterior or sinister motive in securing a transfer of title from Brannon to the grantees. How any benefit would enure to Law from the change of ownership does not obviously appear, and none is suggested, except that, as some doubt of the capacity of Brannon to engage in transactions of that character may have existed in his own mind, a change in the title while Brannon was living would render his right to the timber less precarious. Such, in substance and effect, is the argument of counsel, as we apprehend it. But, whatever may have been the motives and purpose of Law, if any such he had, these circumstances, if established, would show only that he had an opportunity to exercise an undue influence over the grantor, and not that he actually did exercise it. They generate a mere suspicion that he unduly influenced the making of the conveyance.

But proof of suspicious circumstances, dissociated from other facts of probative force, duly established, does not alone warrant a decree of cancellation. On him who alleges undue influence as ground for such relief rests the burden of showing with reasonable certainty the facts legally deemed necessary

to effectuate that result. Suspicion does not suffice. Besides, Brannon, according to the uncontradicted evidence, reposed confidence in Law. For him, at his instance and request, Law prepared two or more wills, subsequently destroyed by Brannon, and other contracts relating to his lands. True, Law undertook to prevent the appointment of a committee for Brannon. But from such interference can the existence of illegitimate motives reasonably be inferred? There is as much reason for a wholly different motive. His friendship for a neighbor may have prompted his interposition in that proceeding. He secured the appearance of an attorney for Brannon, and sought a continuance of the hearing upon the motion for the appointment of a committee until a later date to procure the attendance of witnesses to show want of necessity for the proposed appointment. Must we say his activity was due solely to a desire to promote an interest purely personal to himself? That would necessitate an assumption wholly without the support of reason or authority. Besides, it appears from the proof, though somewhat indefinite in character, that Brannon had previously expressed an intention to provide for the grantees out of his estate in recognition of his responsibility for his paternity of the three and conduct toward the fourth. Though meager, this evidence is not contradicted. To us the proof seems wholly insufficient to establish the charge that the deed in question was procured through the exercise of undue influence on the part of the grantees or any other person acting in their behalf or at their instance and solicitation.

Nor can we reasonably accord much weight to the testimony introduced by plaintiff to show want of consideration for the conveyance; such consideration, as appears from the deed, being $4000, $2000 of which was paid when the deed was delivered, and the residue evidenced by a note executed by the grantees payable to the grantor on or before twelve months after date, with interest therefrom, purporting to be "for value received in land". It was produced by counsel for defendants, identified by Law as a witness, and filed with his deposition; the natural and reasonable presumption arising from such production and possession by defendants being that they had since paid the note. It clearly appears, and is not

disputed, that $2000 was paid to Brannon by the grantees upon the delivery of the deed. But it is argued that because Brannon about that time withdrew from the bank, by check chargeable to funds therein deposited to his credit, ''twelve or thirteen hundred dollars'', that sum he delivered to the grantees, who repaid it to him as and for part of the cash payment recited in the deed. That argument, however, finds no more substantial basis than the testimony that John or Henry, sons of Pinkard Brannon, thereafter found concealed in an outhouse $1260, which plaintiff subsequently caused to be re-deposited in the bank, and which the cashier said appeared to him to be the same bills and notes withdrawn by the check. Though conceded to be true, as stated, these circumstances do not necessarily tend to impeach the deed as for want of consideration. They may generate a suspicion of a resort to subterfuge; but, as observed, there is no authority for determining the merits of a cause upon mere suspicion. That $2000 was paid before the deed was delivered is proved beyond question. The grantees produced the money; Tyson and Law counted and delivered it to the grantor, who received and kept it.

Besides, Brannon was not indebted at that time, so far as appears. He then owned valuable real estate free of encumbrances by liens, and had in bank to his credit an amount in excess of $6000 available for the payment of any small amounts owed by him at that time. He recognized a duty owing by him to the grantees. To them, if so minded, he could have conveyed the land as a mere gratuity. They need not have paid him anything therefor. His deed need not have recited any consideration. Or he may have withdrawn the money, and permitted its use, in the manner claimed, as a subterfuge solely to show that the grant was upon a consideration deemed valuable in law. Moreover, from what has been said, it is obvious, in the absence of evidence to the contrary, that the grantees did furnish at least part of the $2000 cash payment—the difference between it and the ''twelve or thirteen hundred dollars''. While their resources apparently were not extensive, it affirmatively appears they had some property, were somewhat actively engaged in buying and selling stock, rented, cleared and tilled lands, and as a result

thereof acquired some money—how much we are not advised and have no means of ascertaining.

Indeed, plaintiff does not seem to lay great stress upon what occurred at the time of the execution of the deed, though he does demand our consideration of the attendant circumstances. The principal contention in this particular is that the withdrawal of the money from the bank, its delivery to the grantees, and their redelivery thereof for the purposes of the transaction, as claimed, evince a fraudulent design in the consummation of the conveyance. But whom did the parties intend to defraud? Not any of Brannon's creditors. If any he had, they are not complaining. Not his children, because he could devise or convey all his lands, if he so chose, without leaving any of it to them. It was his land. With it he could do as he pleased. By his labor he acquired it; and, if possessed of the requisite capacity, he could grant and convey it to whomsoever he might elect as the beneficiaries of his bounty.

Did he have sufficient capacity to execute a valid deed? To this inquiry in the main is directed the great volume of testimony introduced by both parties; and, while conflicting, the evidence, we think, clearly preponderates in favor of an affirmative answer to the interrogatory propounded. No witness present when the deed was executed testified that Brannon was not then competent to execute it. When asked if Brannon had mental acumen sufficient to comprehend the nature and effects of the deed, or whether he then had sufficient knowledge and understanding to transact business of that kind, Leggett, who witnessed the signature, replied, "I don't know anything about that"; but added, "Well, I didn't see anything wrong with him on that day as far as I could notice." Tyson, then also present, signed the paper as a witness. He had had different transactions with Brannon prior to that time, covering a period of several years. He testified that he "couldn't see any difference in business than when he was dealing with" him theretofore. He had borrowed money of Brannon and settled therefor, before and subsequent to the date of the deed, on which occasions Brannon accurately calculated the interest due thereon "in his head", as the witness expresses it; that is, without the use of any artificial aids. In its trend, the testimony of Tyson shows Brannon was com-

77 W. Va.

petent to transact business before, at the time of and since such conveyance.

On February 3, 1912, soon after the appointment of plaintiff as committee, Martha Greathouse, at the dictation of Brannon, and presumably referring to the appointment of the committee, wrote to J. V. Blair, his attorney, saying: "Sir, I have a law suit on hand, and I want to employ you for my attorney. I did not get justice. And I want it removed to West Union, and I want you to employ three good Drs. to testify whether I am capable of doing business or not. I want you to take charge of it at once. I want you to get the Drs. and come at once to have me examined". The abbreviation "Drs.", she said, meant doctors. If it be true that Brannon did dictate the letter, he possessed a mental comprehension of the purposes he had in view, in writing and sending it, unusual among persons only occasionally resorting to correspondence relating to their property. And, although the witness furnished on cross-examination information from which counsel to some extent could have tested the accuracy of her statements, they did not do so. But, as confirmatory thereof, and pursuant to the request evidenced by the letter, doctors Pearcy, McGovern and Lawson did on February 17, 1912, at the residence of Abe Cogar, make what according to their testimony seems to have been a careful and detailed examination and diagnosis of the physical and mental condition of Brannon on that day. They employed what they say are the ordinary and usual methods of making such examinations. As a result thereof, when asked as to Brannon's condition, McGovern replied, "About as the average old man", meaning a man from seventy-five to eighty years old; "I believe that he was sane"; Lawson, "From our examination I saw nothing to the contrary (of sanity) at that time"; Pearcy, "He did not manifest enough disorders of the mind at that time to say that he was other than sane".

No material variance can be said to arise between the testimony of these physicians, and of doctors Eddy, Chapman and Woofter, witnesses for plaintiff, relative to the arterial condition of the grantor, although approximately a period of two years elapsed between the dates of the examinations made by them. When treated by the three physicians last named,

at various times from 1909 to 1911, the arteries of Brannon were in an acute sclerotic condition, but responded to the prescribed treatment. McGovern, Pearcy and Lawson recognized the existence of *arterio-sclerosis* two years later; but the acute condition had disappeared, and they reported the arteries to be normal for one of Brannon's age.

The disease or physical condition mentioned results from an increase of the connective tissues of the arterial walls or of their inner coating, resulting in a progressive thickening and contraction of the vessels, thereby causing a diminution in the supply of the blood to their own walls, terminating in a degeneracy of the structure and corresponding inability to effecutate the purposes they were intended to serve. While not curable, such condition is partially remediable, just as Brannon's condition did yield to treatment. *Arterio-sclerosis,* it is true, accelerates any tendency of the person affected towards Bright's disease, due to the involvement of the small vessels of the kidneys, and frequently but not necessarily a total impairment of the brain cells or the mental faculties. They are only symptoms that the physical machine has reached the stage where it begins to show signs of yielding to the wearing out process. So that, as doctors McGovern, Pearcy and Lawson have said, Brannon's condition was such only as would virtually be expected in one of his age. In that statement, they accord with the views expressed by Chapman, Eddy, Woofter and Hall. They, while saying such ailments are not wholly curable, testify that they do under proper care, and Brannon's condition did, yield to treatment. Though called to render medical aid to Brannon in 1910, Chapman treated him principally for *hemi-plegia,* but found him suffering from *arterio-sclerosis,* whereby the arteries lose their elasticity and in a certain position there occurs undue blood pressure on the brain, rendering the brain action uncertain and leaving the person in a state of *senile dementia* or a deviation from a normal condition. But the only effect of Brannon's condition, according to the witness, was lack of positiveness in speech, a bad memory, and a desire to marry the mother of his daughter-in-law. Woofter cautiously said that from his examination and knowledge of Brannon, he "would think that he was not capable of attending to his business

affairs", and would easily be influenced. Eddy was more positive in denial on the question of competency. He fixes the date of incapacity early in 1910, and says it continued thereafter until the time of his testimony.

Many of the neighbors and friends of Brannon by their testimony, however, declare he always was particular, careful and cautious in acquiring or disposing of property, the loan- ·
ing of money, calculation of interest, dealing at the stores and with the banks, in leasing property for oil and gas and in the extension of oil and gas leases when the term thereof was about to expire; that he manifested an intelligent interest in the events occurring in his community; and that, although sometimes he failed promptly to recognize persons with whom he theretofore reasonably had been familiar, yet, when they told him their name, he chided himself for not recollecting them, and sometimes but rarely declined to believe he had ever known them. He did not at once recognize his son on his return after a prolonged absence from the state. These faculties they say he possessed at the date of the deed, and retained until he died pending this litigation.

Other non-expert witnesses, it is true, deny capacity. But they reach that conclusion, for the most part, because of the grantor's failure at times to recall the names of persons with whom he had theretofore been acquainted. Such lack of memory, however, was not constant, but occasional. Besides, if such were the true test, few aged persons would escape enumeration in the excluded class. Some of the witnesses who prescribe this limitation were themselves unable to recall many incidents relating to matters on which they based their conclusions.

What we have said will indicate the probative force and value of the evidence as a whole, in view of the many decisions of this and other courts respecting deeds by aged persons and declared valid upon controversies as to the capacity of the grantors. *Woodville* v. *Woodville*, 63 W. Va. 286; *Delaptain* v. *Grubb*, 44 W. Va. 612; *Teter* v. *Teter*, 59 W. Va. 449; *Black* v. *Post*, 67 W. Va. 253. These cases hold that mere age or infirmity of mind and body is not sufficient to overcome the legal presumption of mental capacity in a grantor to execute a deed; that the true date of the test is the time of such trans-

action; that it must affirmatively appear he then did not have capacity sufficient to understand clearly the nature and consequences of the act challenged and the objects of his bounty; that, to avail as ground for cancellation, undue influence must be such as wholly to destroy the free agency of the grantor and in lieu thereof to substitute the will of another; and that a mere motive and opportunity to exert such influence, together with failing mental powers of the grantor, do not suffice. On plaintiff devolved the burden of showing by satisfactory proof lack of the requisite mental endowments for the grant of property, and to overcome the legal presumption in favor of the capacity of the grantor. The burden so assumed, we think, he has not successfully met. On the contrary, the evidence tends strongly to re-enforce the presumption of capacity.

Other questions discussed by counsel are not now material; because, for the reasons stated, we have reached the conclusion to reverse the decree of the circuit court and dismiss the bill.

*Reversed and bill dismissed.*