# CHARLESTON.

CLINTON A. CURTIS *et als.* v. I. R. CURTIS *et als.*

Submitted October 21, 1919.   Decided October 28, 1919.

1. WITNESSES—*Heir Incompetent to Testify as to Mental Capacity of Grantor.*

    One who would inherit an interest in land, in case a deed, which is attacked upon the ground of lack of capacity of the grantor, is set aside, is incompetent to testify as to the mental capacity of the grantor in such deed, and this disqualification extends to the wife or husband of such person. (p. 40).

2. SAME—*Where Grantee Testifies as to Competency of Grantor Adverse Parties Can Testify.*

    Where, however, the grantee in such deed testifies as to the mental capacity of the grantor therein,. those seeking to overthrow the same become competent witnesses upon that question under the exception contained in section 23 of chapter 130 of the Code.   (p. 40).

3. DEEDS—*Prima Facie Proof of Undue Influence.*

    Proof that the grantor in a deed was feeble, both in body and mind, reposed great confidence and trust in her son, the grantee therein, who acted as her agent under a power of attorney giving him full authority to manage, dispose of and convey her estate, that he procured his attorney to prepare the deed conveying all of the grantor's estate to him for an insubstantial consideration to the exclusion of another son and a daughter who were left entirely unprovided for, and which deed was executed while the grantor was living with the grantee in his home, without any independent advice being obtained by the grantor or any opportunity for obtaining such advice, establishes *prima facie* the charge of undue influence by the son, and where such *prima facie* case is not overthrown by clear evidence that the grantor was of sound mind and acted independently and upon her own judgment in executing such deed, the same will be set aside.   (p. 41).

 Appeal from Circuit Court, Upshur County.

Suit by Clinton A. Curtis and Mollie E. McNemar against I. R. Curtis and others, to cancel a deed.   Decree for plaintiffs, and the named defendant appeals.

*Affirmed.*

C. N. *Pew* and *H. Roy Waugh,* for appellant.
*Young & McWhorter,* for appellees.

RITZ, JUDGE:

The plaintiffs Clinton A. Curtis and Mollie E. McNemar, and the defendant I. R. Curtis are children of Katherine E. Smith, who was twice married, her first husband being Isom Curtis, the father of the plaintiffs and the above named defendant. After the marriage of Mrs. Smith to her last husband she resided with him on a farm in Upshur county until the spring of 1912, when their house was destroyed by fire. They then for something like a year lived with various of the children of Mr. Smith by his first wife. Early in the year 1913 they acquired a house in the town of Buckhannon in what is known as the Liggett Addition, which was conveyed to Mrs. Smith, although paid for by her husband, in consideration that she release her contingent right of dower in some other lands owned by him. The Smiths continued to reside at this place until the death of the husband in the latter part of July, 1915. At that time it is conceded by all parties that Mrs. Smith was in a very feeble physical condition, and it is contended by the plaintiffs that her mental faculties were very much impaired, if not entirely destroyed. After the funeral of Mr. Smith, and on the same day, the plaintiffs say that at the instance of their brother I. R. Curtis they entered into an arrangement for taking care of their mother. According to their contention it was agreed among them that her mental and physical condition was such that she was not able to take care of herself or of her property, and they agreed that she should live with that one of her children that she might select, and that such one should receive reasonable compensation for caring for her out of her property, and at her death what remained should be divided equally among them. She was allowed to remain at her home for a few days after her husband's death in charge of Mr. and Mrs. Queen, who were employed for the purpose of caring for her. She was then removed to the home of her daughter Mrs. McNemar in Lewis county, where she remained until about the 25th of September, 1915. At that time she was taken back to Buckhannon and placed in the home of Mr. and

Mrs. Queen, where she remained until about the third of October, when she was taken to the home of I. R. Curtis, also in the town of Buckhannon, where she remained until her death on the 19th of December, 1915. On the 30th day of July, 1915, the defendant I. R. Curtis procured from his mother a power of attorney authorizing him to transact her business, sue for and recover any monies that might be due her from anyone, collect the same, to compound or compromise for the same and give discharges therefor, make settlement of her interest in the estate of her late husband Phillip Smith, and also of her interest in the estate of her deceased father, Randolph Jackson, to sign any bond, deed, obligation, contract or other paper, to endorse promissory notes and renew the same from time to time, to draw any money she might have out of any banks, to sell or lease any part or parts of her real estate, and to make all necessary deeds of conveyance, with all necessary covenants of warranty and assurances of title, and sign, seal and acknowledged the same, and to do all other acts and things in relation to all or any part of her affairs that she might do herself. This power of attorney he had recorded in the office of the clerk of the county court of Upshur county. On the 17th day of November, 1915, a deed was executed by Mrs. Smith conveying to I. R. Curtis all of her real estate, consisting of her house and lot in the town of Buckhannon, and her interest in her father's farm in Lewis county. This deed was also placed upon the record on the same day that it was executed and acknowledged, but the plaintiffs say that they had no actual knowledge of it until after the death of their mother in December. Shortly after their mother's death they instituted this suit for the purpose of setting aside and cancelling said deed, upon the ground that it was in violation of the agreement had between the plaintiffs and the defendant I. R. Curtis in regard to taking care of their mother, and the division of the property, and upon the further ground that she was without capacity to make such deed at the time she made the same, and that it was procured from her by undue and fraudulent influence. Much evidence was taken upon the question of the capacity of the grantor to make this deed, and to show the relationship of the various parties to the transaction. The circuit court entered a decree cancelling the deed, holding that Mrs.

Smith did not have capacity to execute the same, and that it was procured from her by the undue influence of the grantee. From this decree this appeal is prosecuted.

In support of the allegations of their bill that their mother did not have capacity to make the deed sought to be overthrown, both of the plaintiffs, as well as their respective spouses, testify as to the mental capacity of Mrs. Smith. There was no objection made to their testimony in this regard at the time it was introduced, nor was it objected to for this reason at any time in the lower court, but it is now for the first time suggested that they were not competent to testify as to the mental capacity of the grantor in that deed, for the reason that it would be in effect testifying to personal communications with the deceased grantor. It is well settled in this jurisdiction that the one claiming under a deceased person cannot, in a suit affecting his estate, give his opinion as to the mental capacity of such deceased person, as such opinion must be based upon communications had with the deceased. Impressions or conclusions reached by the witness as to the sanity or insanity of a deceased party must be arrived at from observations of the conduct of, or from communications had with, such deceased person, and in either event they fall within the inhibition of the statute. *Trowbridge* v. *Stone,* 42 W. Va. 454; *Freeman* v. *Freeman,* 71 W. Va. 303. And it is likewise true that where a witness is disqualified to testify as to such personal communications, his spouse is under like disability. *Freeman* v. *Freeman, supra; Kilgore* v. *Hanley,* 27 W. Va. 451.

But the plaintiffs say that while these witnesses were not competent to testify at the time their evidence was taken, they became competent before any objection was made thereto, or before their evidence was ever read by the chancellor, because the defendant and his wife, who were under the same disability, testified as to the mental condition of Mrs. Smith. It is quite true that the defendant and his wife both testify at length as to the mental capacity of the grantor in the deed, and give their opinions in regard thereto. It is insisted that this was testifying in regard to the same communications or transactions to which the testimony of the plaintiffs was directed. It may be said that the observations of the grantor by the witnesses extend practically over the same period of time, they were

of the same general character, and the opinions formed are conclusions reached from the same communications or transactions with the deceased party, and if one of the parties testifies in regard to such communications or transactions, under the exception contained in section 23 of chapter 130 of the Code, the other interested party is authorized to give his version of the transactions or communications. This was the conclusion reached by this Court in the case of *Wooldridge* v. *Wooldridge,* 69 W. Va 554-8. Our conclusion, therefore, is that while the plaintiffs and their spouses were not competent witnesses at the time their testimony was taken, still by the action of the defendant in introducing himself and his wife to testify in regard to the mental condition of his mother he made this evidence competent, and he cannot now complain that it was considered by the chancellor in reaching his conclusion.

As before stated, much evidence is taken by the parties to this suit to establish the mental condition of the grantor in the deed. A number of the children of Phillip Smith, the second husband of Mrs. Smith, were introduced. They had had long acquaintance with Mrs. Smith, and were nearly of the same age, Phillip Smith being many years older than his wife, it appearing that he was past the age of ninety years when he died, while his wife was only about sixty-eight. These children testify that they had known Mrs. Smith for many, many years; that in the year 1912, when the house in which the Smiths lived was destroyed by fire, Mrs. Smith suffered from a severe shock of some kind which seemed to very seriously depress her; that her physical and mental condition continued to grow worse from that day until the day of her death. They testify that during the last illness of their father they were at the house of the Smiths frequently, some of them almost constantly for quite awhile; that Mrs. Smith was at that time in a very deplorable prysical and mental condition; that she did not appreciate the gravity of her husband's illness, and did not understand that he had died. It is insisted that these witnesses were biased and prejudiced against the defendant I. R. Curtis, and that little credence should be given to their testimony. After a careful perusal of the record we cannot see any justification for this conclusion. They certainly had the means of knowledge, and we see nothing

in the record to indicate that their testimony was fabricated because of ill feeling toward the defendant. They had frequent communications with Mrs. Smith after her husband's death, up until the time she died, and they are all of the opinion that for a considerable time before her death her mental condition was such that she did not know what she was doing. Other witnesses are introduced who also testify in the same way. Mr. and Mrs. Queen, who were at the house of Mr. and Mrs. Smith before Mr. Smith's death, and who nursed both of them during that time, and stayed there with Mrs. Smith for a short time after the funeral of Mr. Smith, and at whose house Mrs. Smith stayed after her return from her daughter's in Lewis county in the fall of 1915, testify as to her condition during the time they were at the Smith residence with her and during the time she was at their house in the fall of 1915. They testify that she was incapable of understanding what she was doing during that time. They say that at the time the power of attorney was executed she did not realize what she had done, and that after her son had procured her signature to this paper she inquired of them at frequent intervals what it was that she had executed. They say that while she was at their house she thought she was at her own residence, and called attention to the fact that some trees that were formerly in her yard were not there now; that she frequently did not recognize her close friends and associates of long standing. It is also testified by witnesses that on some occasions she did not recognize her own children. Two physicians testify on behalf of the plaintiffs, one who attended Mrs. Smith while she was at her daughter's in Lewis county, and the other who attended her for some time at Buckhannon. The first of these only saw her on two or three occasions, but he attended her professionally at those times, and says that he found her suffering from paralysis; that she was mentally incapacitated, and that there was in his judgment no possibility of her improving, but that he was reasonably certain that she would continue to grow worse until her death. The other physician saw her on many more occasions, and his conclusion was about the same. However, two physicians testify on behalf of the defendant, and their opportunities were equally as good as those of the physicians

above mentioned. One of these only saw her, however, on one occasion, and that was on the very day she executed the deed. He says that he was present for about thirty minutes, and went there for the purpose of making an examination; that she answered his questions intelligently, and he saw nothing to indicate that there was anything wrong with her mind; that in his judgment she was suffering from locomotor ataxia, which disease does not necessarily affect the mind. The other physician who testified for the defendant had attended Mrs. Smith from a short time before her husband's death until her death, with the exception of the time that she was in Lewis county at her daughter's. He testifies that he saw her on many occasions during that time, and that he believes she was suffering from locomotor ataxia, which does not necessarily affect the mind until shortly before death, and that he did not believe that Mrs. Smith's mind was seriously affected until three or four days before she died. Although he admits that during all of the time she was weak, both in body and mind. Other witnesses testify that they had seen Mrs. Smith both before and after her husband's death, on various occasions; that she always knew them, conversed with them intelligently, and seemed to clearly understand what she was doing.

That her mind was affected there is no doubt. Whether it was affected to the extent that the disposition she made of her property under the circumstances thereof was not in fact her own act is the question we have here. The defendant I. R. Curtis was entrusted by her with the full management of all of her property by the power of attorney before referred to. This conferred upon him large powers, even to the extent of selling and conveying any of her estate. It shows that she had the utmost confidence in him. In fact it may be said that it is strong evidence that he exercised a controlling influence with her even at that time. It is also worthy of remark that at the time he procured this power of attorney he said nothing about it to either his brother or sister, and they had no knowledge of it until after their mother's death. He contends, of course, that he believed his mother was entirely capable of conducting her own affairs, and that he only took this power of attorney from her for the reason that she was physically weak and unable to

get around to look after her business, but why did he incorporate in it authority to sell and convey her real estate if she was entirely competent for the purpose of making a deed? It would have required no physical exertion upon her part to have done this. Then, too, he lived many miles away in another part of the state, and if his mother's convenience was his only motive, this would have been better served by conferring the power upon his brother who lived in the same town with the mother. There is another significant fact in connection with this power of attorney, and that is this recital in it: "I am doing this because I am physically unable to look after these matters, but yet of sound mind." Both of the plaintiffs and the wife of Clinton A. Curtis all testify that on the day of Phillip Smith's funeral they and the defendant I. R. Curtis agreed among themselves that Mrs. Smith was mentally incapable of transacting her business; that this was I. R. Curtis' own suggestion, and that they assented to it because it was a fact. They introduced two letters written by the defendant I. R. Curtis on the 31st of August, 1915, one to his sister, and the other to his brother. In the letter to his sister he insists on their getting together and agreeing on how his mother shall be taken care of, and insists that his sister be compensated for her care and attention to her, and also states that anything that is left of the mother's estate after they have provided for her they will divide equally among themselves. He also makes the suggestion in this letter that there is no necessity of worrying their mother about it, for she in all her suffering cannot have a clear conception of what she wants, but that he is sure she will want all of her children to share equally. Substantially the same statements are made in the letter written on the same day to his brother. These letters, it is urged, are inconsistent with the statement that he believed his mother's mental condition was sound, and that she was competent to take care of her affairs. Pursuant to these letters he did come to the home of his sister in Lewis county where his mother was then staying, and removed her to Buckhannon. He claims that he did this because his mother desired it, she complaining that her daughter's children disturbed her. The defendant then kept her at his house in Buckhannon until she died in December. It appears that on the 15th of November he had

the deed prepared which is sought to be set aside in this case. He says that he did it at the repeated solicitations of his mother. It conveys all of her property to him, in consideration that he support and maintain her during her life. It was reasonably certain that she could live but a short time. This is shown clearly by the medical testimony, and while he says that he was reluctant to have his mother execute this deed, it does not appear that he ever suggested that she consult with her other children in regard to it, or in fact with anyone else, nor is there any evidence that she ever did consult with anyone else in regard to it. At the time the deed was acknowledged it was not read over to her, the defendant making the statement that he had read it to her the day before, and she knew what was in it. The officer who took the acknowledgment and the witness who was present and witnessed her mark say that she assented to this statement, and when she was asked if she acknowledged the deed expressed herself in the affirmative, and that this was all that passed at the time of the execution of the paper. It is rather significant that on this very day not only the doctor who had been attending her, but another doctor who had never seen her before, and who was never called to attend her afterward, called to examine her just a short time after she executed the deed. While the defendant placed this deed on record on the same day that it was procured he never said a word to his brother about it, although they lived right in the same town, and saw each other practically every day, nor did he ever mention the matter to his sister. Mrs. Smith, it cannot be doubted, reposed the utmost confidence in her son, the defendant. She was feeble not only in body, but in mind. He acted as her agent. Under the power of attorney which she had given him he was her other self, and we do not hesitate to say that a deed executed by her conveying to him all of her estate, practically without consideration, without any advice or consultation from anyone else is *prima facie* evidence of undue influence in the procurement of it. *Sperry* v. *Johnson,* 80 W. Va. 142; *Turner* v. *Hinchman,* 72 W. Va. 384; *Samuel* v. *Marshall,* 3 Leigh 567; *Hartman* v. *Strickler,* 82 Va. 225; *Whitelaw* v. *Sims,* 90 Va. 588; *Leonard* v. *Burtle,* 226 Ill. 422; *In re Hess' Will,* 48 Minn. 504; 31 Am. St. Rep. 665, and note at page 670 etc; Underhill on Wills, sec. 137. This *prima*

*facie* case is not overcome by the other evidence. In fact we are of opinion that it is strengthened thereby. There are many cases in this jurisdiction in which wills and deeds have been attacked for want of capacity upon the part of the grantors therein. One case furnishes very little light in the determination of another. The relationship of the parties and the conditions which surround them are always different, and the motives which actuate men in the transaction of business are so influenced by these peculiar conditions and circumstances that the decision in one case furnishes little assistance in the determination of another. In this case the learned Judge of the trial court has found that Mrs. Smith did not have mental capacity to make this deed, and that the same was procured by undue influence. His findings were based upon a careful review of all the evidence and we will not reverse the same unless convinced that they are not supported by the showing made. We cannot say that in this case.

Our conclusion, therefore, is to affirm the decree complained of and remand the cause for the purpose of taking the accounts prayed for in the bill.

*Affirmed.*