# CHARLESTON.

J. S. DOAK, ADMR. OF CHARLES DOAK, v. VICTORIA E. SMITH.

Submitted January 23, 1923.  Decided February 13, 1923.

1.   EVIDENCE—*Appellate Court Will Not Take Judicial Notice of Dates of Regular Terms of County Courts.*

   The appellate court will not take judicial notice of the dates at which a county court holds its regular terms.   (p. 135).

2.   INSANE PERSONS—*Appointment of Committee for Non Compos Mentis, Regular on Face, Cannot be Collaterly Attacked.*

   The appointment of a committee for a *non compos mentis,* appearing to have been regularly made by the county court in the manner prescribed by law, cannot be attacked collaterally. (p. 135).

3. SAME—*County Court Not Precluded from Appointing Committee for Non Compos Mentis Because Not Pronounced Insane.*

Chapter 51, Acts 1915, does not preclude a county court from appointing a committee for a person found to be *non compos mentis*, until after the commission of lunacy has pronounced him a lunatic or insane. (p. 135).

4. SAME—*Non Compos Mentis May Maintain Suit to Cancel Deed Executed While Mentally Incapacitated, and When He Had No Committee.*

The committee of a person insane, or *non compos mentis*, can maintain a suit to set aside and cancel a deed or other conveyance made by such person while mentally incapacitated and when he had no committee. (p. 136).

5. DEEDS—*Mere Infirmity of Mind and Body Insufficient to Overcome Presumption of Legal Capacity of. Grantor in Deed; Test of Mental Capacity of Grantor in Deed Determined as of Its Date; Inability to Understand Nature and Consequences of His Act Must Affirmatively Appear to Set Aside Deed of Grantor; Free Agency of Grantor of Deed Must be Destroyed to Constitute Undue Influence; Mere Motive and Opportunity to Exert Undue Influence Not Sufficient; Burden of Overcoming Presumption of Mental Incapacity to Execute Deed and of Undue Influence Upon Assailing Party; Evidence Held Insufficient to Cancel Deed for Incapacity and Undue Influence.*

In a suit to cancel a deed on the ground of mental incapacity in the grantor, coupled with undue influence on the part of the grantee or of some one for him, mere age or infirmity of mind and body is not sufficient to overcome the legal presumption of capacity in the grantor; the true test of his mentality is to be determined as of the time the deed was made and acknowledged, and it must affirmatively appear that he did not then have mind sufficient to understand the nature and consequences of his act, the property conveyed and the objects of his bounty. The undue influence must be shown to be such as to wholly destroy the free agency of the grantor and to substitute the will of another for his, and mere motive and opportunity to exert such influence will not be sufficient. The burden of overcoming the presumption of capacity, and of showing undue influence as defined, is upon the one assailing the deed on these grounds, either by direct or circumstantial evidence. A case in which this burden has not been successfully carried by plaintiff. (p. 137).

Appeal from Circuit Court, Doddridge County.

Suit by J. S. Doak, administrator of Charles Doak, against Victoria E. Smith. From a decree for plaintiff, defendant appeals.

*Reversed, and bill dismissed.*

*G. W. Farr* and *L. W. Chapman,* for appellant.
*Law & McCue* and *J. Ramsey,* for appellee.

LIVELY, JUDGE:

The decree complained of on this appeal cancelled a deed from Charles Doak to Victoria E. Smith, dated December 5, 1919, on the ground that the grantor was mentally incapacitated to make a deed to his property, and that he had been unduly influenced by the grantee.

Plaintiff was duly appointed and qualified as committee of Charles Doak on June 15, 1920, and his right to maintain the suit is challenged, because it is asserted in the brief that the appointment was made at a special term of the county court without proper notice duly posted that such business would be transacted at the special term, and *Mayer* v. *Adams,* 27 W. Va. 245, and *Kirtley* v. *Co. Ct.,* 69 W. Va. are cited to sustain that proposition. The right to sue is also challenged, because it is asserted that under chap. 51 Acts 1915, the county court had no authority to make such appointment until the lunacy commission had first determined that he was insane. We find nothing in the record to the effect that the appointment was made at a special term of the county court, and the bill avers that he was appointed and qualified and is the legal committee, and a certificate of the appointment is exhibited. We do not take judicial notice of the regular terms of county courts, which are held at such times as may be fixed upon and entered of record by the county court. Chapter 39 sec. 6 Code. The appointment of a committee cannot be collaterally attacked. *Lance* v. *McCoy,* 34 W. Va. 416; *Tomblin* v. *Peck,* 73 W. Va. 336. Under the constitution, Art. VIII, sec. 21, county courts have jurisdiction in all matters relating to the appointment and quali-

fication of committees, and that jurisdiction cannot be taken away from them by requiring the lunacy commission to first pass upon the alleged insanity of a person. Chap. 51, Acts 1915 (Chap. 58 Code) does not limit the general jurisdiction of county courts in the appointment of committees for persons found to be *non compos mentis,* and not mentally capable of intelligently conducting their business affairs and conserving their property. Under section 20 of that act it becomes the duty of the county court to appoint a committee or guardian for a person who is declared to be insane by the commission of lunacy, or who is committed to a state hospital. That act was designed to jealously guard the method of determining the insanity or sanity of a person suspected of being insane, and his consequent incarceration in one of the eleemosynary institutions. The appointment of a committee or guardian was only incidental to the main purpose and does not repeal by implication the general jurisdiction of the county court to appoint committees for those persons found to be *non compos mentis. Miller* v. *Sterringer,* 66 W. Va. 169; *Leatherman* v. *Leatherman,* 82 W. Va. 748. The appointment is regular on its face, and, even if it were voidable, cannot be attacked collaterally. *Colley* v. *Calhoun,* 89 W. Va. 399, 109 S. E. 484.

Defendant also challenges the right of the committee to maintain the suit at all, and at any event, because the deed was made before the committee was appointed. The committee's right to sue to set aside the conveyance is fully sustained by reason as well as the authorities cited by his counsel. *Bird* v. *Bird,* 21 Grat. 712; *Hinchman* v. *Ballard,* 7 W. Va. 152; *Straight* v. *Ice,* 56 W. Va. 60; *Knight* v. *Watts,* 26 W. Va. 175; *Barnett* v. *Greathouse,* 77 W. Va. 516, 88 S. E. 1013.

The bill charges that Charles Doak was mentally incapacitated to make the deed to defendant, Victoria E. Smith, his daughter, and that he was induced to do so by undue influence upon her part. These are the gravamen of the charges in the bill around which all of the pleadings and evidence is grouped and upon the decision of which the equities of the cause are to be determined.

From the pleadings and proof it appears that Charles Doak was a strong, healthy man until the last few years of his life, unlearned, not being able to read or write or sign his name, and was a shrewd trader, frugal in his habits, and by industry had accumulated considerable property both real and personal. He married in early life, and there were born to him eight sons and three daughters, all of whom, with the exception of one son, were living at the time of making the deed in question, December 5, 1919, and were living at the time of his death a year or so later. Several years before his death he had conveyed to each of his sons 50 acres of land, in which conveyance it was provided that the real estate conveyed should be in full of the share of such sons in the real estate of their father. Possibly in two of these conveyances he provided that the land conveyed was in full of the distributive share of the grantees in his estate. About this time he made certain gifts or advancements in money or property to his three daughters. He was a soldier in the Civil war and was drawing a pension of $40 per month from the Federal government. In 1918 his wife died, and after that time, he being then 83 years old, it became noticeable that he was in failing health and memory. It was provided in the deeds of real estate to his sons as a part of the consideration, that each son should take part care of him and his wife in their old age. After the death of his wife he went to live with his sons, visiting them and staying with each a portion of the time. About November 16, 1919, he went to visit his daughter, Victoria E. Smith, the wife of Fenton Smith, who lived on Doe Run in a suburb of the town of West Union in Doddridge county. At that time it appears he owned the fee in 23 acres of land on the waters of Brush Run in Grant District of that county, and also one-sixteenth of the oil within and under about 56 acres of land near New Milton; and also the royalty in oil and gas in and under 190 acres of land on Knight's Fork in said county. The deed in question conveyed the 23 acres of land in consideration of $1.00 and love and affection, to Ross Doak, his son; and conveyed, for a like consideration to Victoria Smith, all

of the remainder of his proprety, real, personal and mixed, in said county, excluding therefrom his horse and pension, and which included all his royalty interests in the two tracts of land above described, the 56 acre and the 190 acre tract. As a further consideration of the conveyance to Victoria she was required to pay to her sister Margaret Spencer, a daughter of the grantor, the sum of $200 within one year from the date of the deed, should she receive that amount out of the property conveyed. There was a producing oil well drilled in on the 56 acre tract, and it appears that the 190 acre tract had been drilled a few days before the deed was executed, and a producing well obtained. It is estimated that the royalty interest conveyed to the defendant is worth about $10,000 or probably more. It appears that some time in the summer of 1919 Charles Doak met a relative, a Mr. N. W. Thomas, in the town of West Union, and they entered into a conversation in which Mr. Thomas says the old gentleman told him that his mental condition was being impaired and that he was unable to recollect anything any length of time, and asked his advice as to what he should do under the circumstances, and it was suggested by Mr. Thomas that he get some one he could rely upon to help him, to which advice he seemed to assent, and Thomas testifies that from his long acquaintance with the old gentleman he thought at that time he did not have sufficient mind to transact business of any consequence and did not think he could realize the value of property, and was unable at that time to make a deed and handle property of any amount. Subsequent to this conversation a proceeding was instituted before the county court, at the instance of two of his sons, for the purpose of appointing a committee for him, and the county court appointed Mr. Thomas as the committee, but the old gentleman was dissatisfied, and did not want a committee, and employed an attorney, an appeal was taken to the circuit court, and on the 1st day of December, 1919, that court discharged the committee. Charles Doak at that time was visiting at the house of his daughter, Victoria, and on the morn-

ing of the 5th of December, 1919, sent for his attorney, L. W. Chapman, and directed him to prepare the deed in question, which was accordingly done, and about 3 o'clock that afternoon the notary, H. L. Hammond, went to the home of Victoria and took the acknowledgement. A few days afterwards the deed was admitted to record. On the 19th of December following, Charles Doak was taken before the commission of lunacy at the court house, for the purpose of determining if he was insane and should be sent to one of the eleemosynary state institutions. After a full hearing, in which Charles Doak was examined, touching his business capacity, his memory and ability to recognize his friends and acquaintances, in which he was put to various other tests, and examined by eminent physicians summoned for that purpose, who gave their evidence and made a report, the commission of lunacy dismissed the charge against him. Two of the members of the commission were afterwards examined as witnesses touching his mental capacity at that time, and explained that while they did not think he was insane, and should not be sent to an asylum, yet they were of the opinion that he was not able to transact ordinary business at that time. In the following March or April Charles Doak left the residence of Mrs. Smith to visit another daughter or son, and it does not appear that he was again in her home. On June 15, 1921, plaintiff, D. N. Doak was by the county court duly appointed as committee for his father.

A short time afterwards this suit was instituted, and while it was pending the old gentleman died, and the suit was revived in the name of his personal representative and heirs. However, his deposition was taken on behalf of the plaintiff on October 25, 1920, and it appears therefrom that at that time his mind was almost totally gone, he did not know how old he was, where he lived, what property he had; how many children he had or their names; did not remember any proceedings in the county court concerning his mind and competency; and denied executing the deed to Victoria E. Smith, in question.

The examination had at the inquisition of the commission of

lunacy on the 19th of December, together with the evidence of the physicians who attended that hearing, as well as other witnesses, were introduced by plaintiff for the purpose of showing the condition of the grantor's mind as of that day, and as having a bearing upon his mental capacity at the time he executed the deed on the 5th of December. The condition of the grantor's mind both before and after the time of making the deed is proper to be considered for that purpose. *Kerr* v. *Lunsford,* 31 W. Va. 659. Numerous witnesses were examined by both plaintiff and defendant concerning the mental condition of the grantor, both before and after the time of the deed. Three physicians, Drs. Freeman, Baker and McGovern, testified for the plaintiff. McGovern was one of the physicians who made the examination on the 19th of December on the occasion of the sitting of the commission of lunacy, and said that his physical condition at that time was that of the average of a man for his age; that his memory was not good; that he seemed somewhat agitated over the attempt to put a committee over him or for some other reason and that he could not count money correctly, and that he did not have sufficient mind, in his opinion, to understand the effect of a deed and know the value of real estate or property of any considerable quantity; that it was not unusual for men of his age to be somewhat deficient in memory; that he was worse in these respects on June 14, 1920, when he made another examination, and from his observation made at the two examinations he concluded that the physical and mental condition of the patient came on gradually. To the same effect was the evidence of Dr. Freeman, who made an examination in company with Dr. McGovern on June 14, 1920. He stated that the patient was suffering from arteriosclerosis, and that his mind was then in bad condition; that in his opinion he would not know the result or effect of a deed, and that his mind was not then as good as an ordinary child of from 6 to 8 years of age. Before that time he had not been called upon to treat the patient professionally, but had known him for about 20 years. Dr. Baker had known Charles Doak for about 15 years, and a portion of that time

had been his family physician.   He stated that up to the
time of his wife's death in 1918 his ability to do business
was as good as the average man who had no education, and
that his mentality was as good as the average man, but in
the month of November, 1919, he saw and observed him at
·Hi Spencer's and made an examination of him then and
noticed that mentally and physically he was much weaker
and could not concentrate his mind when trying to tell about
his ailments; and it was his opinion that this condition came
on gradually and grew worse; that on two occasions in Feb-
ruary, 1921, he treated him at the residence of one of his
sons, and found his mind very bad and in much worse con-
dition and weaker than when he examined him at Spencer's
in November, 1919.   He gave it as his judgment that during
November, 1919, and after that time his mental condition
was · such that he could not understand and realize the
value of the property or the effect of its disposition by deed.
Dr. Poole, examined by defendant, was one of the physicians
who participated in the examination on the occasion of the
inquisition for lunacy, and stated that on the 22nd of De-
cember, 1919, he made a careful and extended examination
of Charles Doak, whom he had known for ten or fifteen years,
which examination was for the purpose of testing his mental
condition at that time, and as a result of which he made a
report to the commission of lunacy; and his opinion, after
close physical and mental examination, was that he was capa-
ble at that time of executing deeds and making contracts;
that while his memory was not good it was no worse than
was usual in a man of that age; that afterwards in the win-
ter of 1920 he was again called upon to attend Charles Doak
professionally, and found him worse at that time, stating
that he had suffered a partial stroke of paralysis, but on that
examination his mind seemed to be fairly good, although he
was weak both mentally and physically.   He stated that the
patient was suffering from some kidney trouble, no doubt
superinduced by the arteriosclerosis which we understand
to be a hardening of the arteries, which sometimes results in
Bright's disease.

Thus, it will be seen that the medical testimony is conflicting; and it is apparent therefrom that during the time when these medical examinations were made the mental condition of the patient was better at some times than at others. Arteriosclerosis is said to be a progressive thickening and contraction of the arterial walls which causes a diminution of the supply of blood in the arteries, and while it is said to be incurable it is remediable and responds to treatment. As above suggested, it often superinduces Bright's disease, which combined with the lessening of the supply of blood through the arteries works an impairment of the brain cells and often leaves a person in a state of senile dementia. But medical treatment, or a natural clearing or. partial clearing of the poison engendered by an. improper functioning of the kidneys will relieve the effect on the mind and consequently the patient has clear or clouded mentality according to his physical condition.

The non-expert testimony of the witnesses indicates that both before and after the execution of the deed his mental condition was clear or clouded and imperfect on the various occasions on which the witnesses talked with and observed him. Quite a number of persons who had known him for many years give it as their opinion that for some time before the execution of the deed and thereafter he was not mentally capable of intelligently handling his business or making a disposition of his property; on the other hand, quite as many of his friends and neighbors who had known him practically all his life, including one minister of the gospel who made frequent visits to his house, stated that from their observation and experience with him he was fully capable of transacting business and making disposition of his property.

It would serve no useful purpose to analyze and give the substance of the testimony of each of the witnesses. Enough has been said to substantially give the import of their testimony on that particular point.

While the condition of the mind of the grantor before and after the execution of the deed may be taken into consider-

ation, and is always proper as tending to show the condition of the mind at the time the deed was executed, it is well settled by our decisions that in determining the mental capacity of the grantor the time to be looked at and carefully examined and weighed is the time when the deed or other instrument was executed. *Kerr* v. *Lunsford,* 31 W. Va. 659; *Jarrett* v. *Jarrett;* 11 W. Va. 584; *Buckey* v. *Buckey,* 38 W. Va. 168. It is reasonably concluded from the evidence that Charles Doak's mind for some time prior to the execution of the deed and after it for several months was brighter or more clouded according to the acuteness of his disease. This is accentuated by the medical testimony, some of the doctors saying that the disease was progressive and by reason thereof the patient's mind was not in condition to intelligently transfer property; while another physician who made a careful and searching examination for the purpose of determining his mental capacity and alleged insanity, found his mind to be reasonably clear a short time after the execution of the deed, and gave it as his opinion that he was capable of disposing of his property and of making contracts. The same conclusion may be reached from the testimony of the non-experts. Now, what evidence have we of the condition of the grantor's mind at the time the deed was made and signed? This is the crucial question in respect to his capacity. On this point we have the evidence of L. W. Chapman, the lawyer who prepared the deed, and H. L. Hammond, the notary who took the acknowledgment. We cannot and do not consider the testimony of the subscribing witnesses, defendant and her husband, because they are vitally interested. Chapman testifies that on the morning of the 5th of December he received a message from Charles Doak that he, Doak, desired to see him at the home of Victoria, and when he responded to the message in order to see what the old man wanted, the grantor told him that he had decided to make a disposition of his business and wanted the deed written and wanted to dispose of his property. He gave him specific directions as to how, and to whom, and what property he desired to convey, and from the directions so given he took a written memo-

randum and afterwards prepared the deed in accordance therewith; that while Victoria Smith and her husband were in the room at the time, they made no suggestions whatever concerning the matter in hand, except when the old gentleman concluded that his daughter Margaret Spencer should receive a portion of his bounty, and addressed Victoria in respect thereto, she told him that he was fixing up his business and to fix it up to suit himself. This witness says that the grantor told him he wanted to convey the 23 acres to Ross Doak, his son, and the remainder of his property, with the exception of the horse and buggy and pension, to Victoria Smith. He said the old man gave him the "dimensions" of the deed he wanted prepared and that from his conversation, demeanor and the particularity with which he described his property and told how he wanted to dispose of it, he was convinced that he knew what he was doing, what he wanted and how he wanted to dispose of his property, and that the deed was in strict accordance therewith. It is argued that because this witness is one of the counsel for defendant in this suit, the same credence should not be given to his testimony as if he was not interested professionally. If that be true then we must conclude that other witnesses, friends and neighbors, who have testified to the clarity of the old gentleman's mind on the occasions when they met, talked with, and observed him, were influenced by ulterior motives. This witness' testimony is no stronger than many others who are not interested, and he is corroborated as to the mental condition by the notary, Hammond, who concededly has no interest in the litigation. Hammond says that the deed was dictated to him by Chapman and that he proceeded to take the acknowledgment about 3 o'clock that afternoon. He found Mr. Doak sitting before the gas stove and who did not recognize him at first, but when he told him his name, replied "Oh, yes, Hammond. I recollect now." The witness then told him that he had the deed which Chapman had prepared, and he had come up to take the acknowledgment, and the old gentleman said "All right." He then read the deed to him and was told by the grantor that it was the way he had

told Chapman to fix it. He was then requested by the old gentleman to read the boundaries of the property over again, which being done he said it was the property. He then signed his name by mark, and acknowledged it. On this occasion the grantor told the notary that he had given his boys about 50 acres of land apiece, and said he wanted to give the girls something. This witness testifies fully as to what occurred at that time, and from his observation of the grantor, it was his opinion that he was competent mentally to make the deed. It is well settled that the testimony of the scrivener, the notary, and subscribing witnesses to a deed is entitled to peculiar weight. *Kerr* v. *Lunsford,* supra, pt. 15 syl.

Our cases of *Woodville* v. *Woodville,* 63 W. Va. 286, *Delaplain* v. *Grubb,* 44 W. Va. 612, *Black* v. *Post,* 67 W. Va. 253, *Teter* v. *Teter,* 59 W. Va. 449, and *Barnett* v. *Greathouse,* supra, all established the proposition that mere age or infirmity of mind and body is not sufficient to overcome the legal presumption of mental capacity of a grantor in a deed; that it must affirmatively appear that at the time of the execution he did not have capacity to understand clearly the nature and consequence of his acts, and the objects of his bounty. The burden of establishing his mental incapacity at the time the deed was signed and acknowledged rests upon the one who attacks the deed. We do not think the plaintiff has carried that burden by a preponderence of the evidence. Much argument is based on the fact that at the time the deed was executed the grantee actually paid the old gentleman $1.00, the amount of money consideration mentioned in the deed. We can see nothing unusual or important in this incident. It is a common impression among the people generally that something of value must actually pass in order to make a deed of any validity, and it is likely that this impression existed both in the mind of the grantor and the grantee. It was not necessary that any consideration should have been named in this conveyance except that of love and affection. It was not a deed of bargain and sale.

It was a voluntary disposition of property by the owner which he had a right to dispose of as he wished, and deemed best.

We now come to the second proposition on which the deed is sought to be cancelled. Was there sufficient undue influence exercised by the grantee which would render the deed invalid? This court has spent considerable time in considering and discussing this case, and especially this question of undue influence, and in view of the decision of the learned judge who pronounced the decree some of the members of this court would affirm it; but the majority have come to the conclusion that the evidence does not warrant the conclusion that the grantee exercised an undue influence as de fined in our decision, and therefore, would reverse. The evidence of fraud and undue influence must be strong and convincing to set aside a deed. The rule is well stated in the 5th point of the syllabus in *Woodville* v. *Woodville*, 63 W. Va. 286, as follows: "To set aside a deed for undue influence, it must appear that the influence was such as wholly to destroy the free agency of the grantor, and to substitute the will of another for his; and unless such taking away of free agency appears, the showing of a motive and an opportunity to exert such undue influence, together with failing mental powers of the grantor, are not sufficient to overthrow the deed." We have no direct evidence that Victoria exercised or attempted to exercise any influence over her father in the disposition of his property. It can only be inferred from circumstances which are admittedly strong. Her father was old, losing his memory, diseased, and was dissatisfied to stay at any particular place for a great length of time after the death of his wife. He had come to his daughter's house for a visit and it was about that time that he conceived the notion or delusion that his sons were attempting to deprive him of his property. No doubt the proceeding for the appointment of a committee about that time incensed him, and it may have been that his daughter encouraged him in the resistance of the appointment of the committee, and in this way and by her kindness to him while at her house exerted a natural in-

fluence upon him resulting from these facts and from the relation of father and daughter. It may have been that she actually solicited the making of the deed, although that is an inference, and that she reminded him that she had often come to his home while her mother was living and worked for them and administered to their comforts without pay, but for love and filial duty, and that by reason thereof she ought to be remunerated; it may be that she directed his attention to the fact that he had deeded real estate to his sons, her brothers, and that he had made advancements to the other girls, and had loaned $1,000 to the husband of one of his daughters for which he had received nothing in return; but would these things (which are inferred), if they had been specifically proved, be sufficient to warrant the conclusion that she had substituted her will for his, and that when he made the deed he had no free will, but stood in *vinculis*. But it nowhere appears that he was improperly solicited by any one to make this deed, and we must conclude that it was made by his own free will and accord. Who induced him to include in the deed the 23 acres to Ross Doak, who was not present and who appears to have known nothing of the deed or that it was contemplated, until after it had been made and acknowledged? It is in evidence that he gave this additional bounty to Ross· Doak because his wife before her death had requested it; and it is in evidence that he desired to favor Victoria because she had often worked for him and his wife, at least once a year over a period of many years and for which she had received no pay. We do not find that this fact that she did so is controverted by any witness. "Influence obtained by acts of kindness and attention is not an undue influence; and if a grantor or testator is by such acts influenced to convey his property or bestow a bounty, the transaction will not be invalid for that reason." *Hale* v. *Cole,* 31 W. Va. 576. The case of *Curtis* v. *Curtis,* 85 W. Va. 37, on which plaintiff places much reliance, is somewhat different from the instant case. In the Curtis case the grantee stood in a peculiar relation to his mother, the grantor. She was old and enfeebled and was suffering from locomotor ataxia,

and like Charles Doak, had loss of memory, illusions and eccentricities. A considerable while before the execution of the deed to Curtis he had obtained from his mother a power of attorney to transact all of her business, and sell all of her property. It was said that this fact was a strong evidence that he exercised a controlling influence with her even at that time. Afterwards she came to reside permanently in his home, and in her last sickness when it became evident that she could live but a short while, he obtained a deed from her conveying all of her estate to him in consideration of her maintenance and support during the few remaining days. There was much evidence of his personal influence with her, and how she deferred to his judgment and suggestions on all occasions. Moreover, prior to the execution of the deed Curtis had a tentative agreement with the other heirs that he would take care of their mother and that the property would be divided, and that he had violated this agreement by obtaining from her the deed upon the consideration mentioned. There was bad faith on his part, and it was held that under all the circumstances a prima facie case of undue influence had been established which he failed to rebut. We have no such situation here. There are no circumstances tending to show that Victoria exercised at any time any undue influence, and it can only be inferred from her opportunity to do so while he was on the short visit to her home. Moreover, we have the direct testimony of Chapman and Hammond that while Victoria and her husband were present at the time the deed was directed to be made and the "dimensions" thereof given and the acknowledgment taken, neither of them in any manner attempted to assert any influence upon the execution of the deed or made any suggestion relative thereto; and we have already concluded that at that time the grantor had sufficient mentality to make a valid deed. The necessary requirement of law of the quantum of undue influence, to-wit, that the influence must be such as to wholly destroy the free agency of the grantor and substitute the will of another for his, has not been met. We think that if a *prima facie* case

of undue influence may be inferred from the circumstances, it has been sufficiently rebutted.

In the case of *Deem* v. *Phillips,* 5 W. Va. 168, which is cited by the learned judge in his opinion in support of the decree, it clearly appears from the evidence of those present that at the time of the signing of the deed, the grantor scarcely knew what he was doing, and was then influenced by the grantee and those in interest to procure the deed. That deed was in the nature of a contract by which the grantor conveyed all of his property in consideration of his maintenance and support for his remaining life, which evidently would be of only short duration, and that there was no necessity for that kind of contract because the income from the estate conveyed was amply sufficient to care for him during his remaining days. The present deed is for the consideration of love and affection. It appears that the grantor took into consideration his pension of $40 per month, and no doubt the obligation of his sons to maintain him for the real estate which he had deeded to them. The question of contract and the necessity therefor does not enter into this case. It was one of the controlling factors in the Deem case. It must not be overlooked that Doak conveyed 23 acres to Ross Doak, and made provision for a money payment to Margaret Spencer. The deed was in the nature of a testamentary disposition of his property and the element of contract does not enter into it.

We have not considered the verbal testimony of the parties in interest on each side of the controversy. There were mutual charges of culpability and vicious conduct among them, which we think have little probative value on the main issues, of incapacity in the grantor, and undue influence on the part of the grantee; and hence deem it unimportant and unnecessary to pass upon the point raised as to their ineligibility to testify, because of the inhibition contained in sec. 23 chap. 130, Code. "Impressions or conclusions reached by a witness as to the sanity or insanity of a deceased party must be arrived at from observations of the conduct of, or from com-

munications had with, such deceased person, and in either event they fall within the inhibition of the statute." *Curtis* v. *Curtis, supra;* *Trowbridge* v. *Stone,* 42 W. Va. 454; *Free-man* v. *Freeman,* 71 W. Va. 303.

We are not unmindful of the rule which accords great weight to the decree of the lower court in such cases, and in view of the recognized ability of the learned chancellor who pronounced the decree, we have carefully read and weighed the evidence, and after much time and consideration, have concluded to reverse the decree, for reasons stated, and dismiss the bill.

*Reversed and bill dismissed.*